NOTICE
Decision filed 01/13/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240790-U

NO. 5-24-0790

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| LYNETTE HONGSERMEIER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 20-L-1411 |
| | ) | |
| COOPER B-LINE, INC., | ) | Honorable |
| | ) | Sarah D. Smith, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justice Boie concurred in the judgment.
Justice Vaughan dissented.

**ORDER**

¶ 1    *Held*:    The circuit court's judgment is affirmed where the defendant was found to have violated the Illinois Equal Pay Act of 2003 and the Illinois Human Rights Act. The award of damages pursuant to the Illinois Equal Pay Act and the Illinois Human Rights Act is affirmed.

¶ 2    Following a bench trial, the defendant, Cooper B-Line, Inc. (B-Line), was found to have violated the Equal Pay Act of 2003 (Equal Pay Act) (820 ILCS 112/1 *et seq.* (West 2022)) and the Illinois Human Rights Act (775 ILCS 5/1-101 *et seq.* (West 2022)) for paying Lynette Hongsermeier (Lynette), a female employee, less than a male employee for substantially similar work. B-Line was ordered to pay Lynette "diminished earnings" damages in the amount of $2,067.26, including interest, from March 10, 2019, to March 22, 2020, and the amount of $32,882.28 for damages from March 22, 2023, to June 30, 2025. The circuit court also awarded

1

$10,000 in special damages for emotional distress and for interfering with Lynette's rights under the Equal Pay Act and attorney fees and costs. B-Line now appeals, asking that the judgment be reversed as there was insufficient evidence to support the circuit court's findings and conclusions, and Lynette's causes of action were preempted by section 301 of the Labor Management Relations Act, 1947 (LMRA) (29 U.S.C. § 185 (2018)). For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      B-Line, Inc. is a wholly owned subsidiary of Eaton corporation, which operates a manufacturing plant in Troy, Illinois. Lynette has been a long-time employee at B-Line, working 24 years in the shipping department. At all times relevant to the proceedings, B-Line designated certain employees as "leads" who were responsible for managerial duties as identified by a job description. From March 10, 2019, to March 22, 2020, Lynette worked as the first shift shipping lead in the shipping department. During this same time period, Eddie Enriquez (Eddie), a co-worker, was employed as the second shift shipping lead. Lynette alleged she was paid less than her male co-employee, Eddie, for performing substantially similar job duties. On October 6, 2020, Lynette filed her complaint in the circuit court of Madison County against B-Line.[1] In count I, Lynette alleged gender discrimination in violation of section 2-105 of the Human Rights Act (775 ILCS 5/2-105 (West 2018)). Count II alleged a violation of "the Illinois Wage Payment and Collection Act (820 ILCS 115 [(West 2018))]." Count III alleged a violation of "the Illinois Equal Pay Act (820 ILCS 11[2] [(West 2018))]." All of the allegations in Lynette's complaint related to her claim that because she was female, she was paid less than Eddie for performing substantially

_____

[1]Lynette alleged she had perfected a charge of gender discrimination with the Illinois Department of Human Rights and was issued a "Right to Commence Action in Circuit Court," thereby exhausting her administrative remedies prior to filing her complaint in the circuit court.

similar work for the job designated as a lead. Lynette sought compensatory damages and special damages pursuant to the allegations in her complaint.

¶ 5     B-Line answered Lynette's complaint and admitted that:

> "At all times it was the policy of Defendant Cooper B-Line, Inc. to designate 'leads' for each department. The leads were responsible for supporting the daily operations of their department and ensuring that the Defendant's performance standards were met for matters including safety, quality, and delivery. In addition, shipping leads were responsible for some managerial duties including assisting workers in their department with their general needs including personal protective equipment, receiving materials, and packing and crating goods manufactured by Defendant. Shipping leads also were expected to maintain key customer relationships with outsider vendors and drivers receiving goods to be shipped."

B-Line denied that it was liable for discriminating against Lynette and for the other acts claimed in her complaint.[2] B-Line further raised affirmative defenses. B-Line claimed that Lynette was paid according to a collective bargaining agreement (CBA). Therefore, the CBA dictated the payment to employees and thus B-Line had legitimate, nondiscriminatory reasons for the difference in pay alleged. Further, because of the CBA, Lynette's claims were preempted by section 301 of the LMRA. Additionally, any claim that B-Line violated the Equal Pay Act more than five years before Lynette filed her complaint was time-barred. B-Line further argued that any claims relating to count I that were not raised in the administrative charge with the Illinois

---

[2]B-Line admitted that Lynette had perfected a charge of discrimination with the Illinois Department of Human Rights and that she was issued a "Right to Commence Action in Circuit Court," thereby exhausting her administrative remedies.

3

Department of Human Rights (Department) or that arose more than 300 days prior to the filing of the administrative charge with the "EEOC/IDHR" were time barred, and finally, that Lynette failed to mitigate her damages when she failed to accept training that would have resulted in a pay increase.

¶ 6 Subsequently, B-Line moved for summary judgment in its favor on all claims asserted by Lynette. B-Line claimed that Lynette worked as a "shipping coordinator lead in the shipping department on the first shift from 2015-2020." B-Line further argued that because Lynette was paid pursuant to a CBA, resolution of the claims in her complaint required interpretation of the contract. Therefore, section 301 of the LMRA preempted Lynette's claims. B-Line also claimed that Lynette did not follow the grievance procedure under the CBA, and therefore no claim under the LMRA could proceed because she failed to exhaust her administrative remedies.

¶ 7 Lynette responded to the preemption defense, and conceded that count II, the Wage Payment and Collection Act claim, required interpretation of the contract and was preempted by the LMRA. She withdrew this count prior to trial. As to counts I and III, Lynette argued that these claims did not require interpretation of the CBA and were thus not preempted. In addition, Lynette argued that her claims arose outside of the CBA, and therefore she did not have to follow the grievance procedure under the CBA. On January 19, 2023, the motion for summary judgment was heard by the circuit court and denied.

¶ 8 On March 21, 2023, and April 11, 2023, the circuit court conducted a bench trial on the merits. Nicholas Knouse was the plaintiff's first witness. Knouse testified that from 2019 to 2020, he was the operations manager for B-Line's Troy, Illinois, plant. Between March of 2019 and March 2020 the only women working as leads at the Troy plant were in the shipping department. Knouse explained that in 2019, B-Line completed a reevaluation process of the required number

4

of leads for particular departments as a result of an unrelated union grievance where "multiple people in the plant [were] being paid lead pay that were not doing the lead role." The shipping department employed approximately ten leads. In March 2019 the union and the company reviewed the payments being made to employees and an attempt at equity in payment for the lead role was put into effect. At the conclusion of the reevaluation, B-Line prepared and posted job descriptions to employ only one lead for the first shift and one lead for the second shift. The job descriptions were identical for the first shift and the second shift.

¶ 9    Knouse testified that Lynette was awarded a bid in 2019 for the first shift lead. The job posting for "Shipping Lead, Shift:1," Lynette's job, included a description of "responsibilities and expectations," and the job posting was introduced into evidence. Knouse explained that Lynette was chosen because she "demonstrated the skill set to be lead over the shipping coordinators" and she "performed very well at her role." Knouse further testified that Lynette had been meeting his reasonable expectations for the job.

¶ 10    Knouse also identified the job posting for the "Shipping Lead, Shift: 2" that was in effect in March of 2019. Knouse testified that this was the posting under which Eddie performed his job. Knouse indicated that the job description for the shipping lead on the second shift set forth the essential functions of the job, but it was "not all inclusive." He testified that the second shift had "additional responsibilities." Knouse indicated that the responsibilities between the first and second shift differed because the second shift often had to step up and do the "dual" position, or train the duals, whereas the first shift shipping lead did not have that responsibility.

¶ 11    Knouse conceded that when the two job descriptions were compared with one another, they were identical and with an identical pay rate, which was posted as "Shipping Coordinator rate + $1 (19.96 + $1 for 2019)." He noted that Lynette and Eddie reported to the same plant manager,

5

that they worked in the same shipping department, that the trucks came into the same docks, and that the same freight was always shipped out. In addition, while in the office, Lynette and Eddie used similar computers and the same software and forms. They both put in a high degree of effort.

¶ 12    Knouse testified that he was not aware that Eddie got paid $0.40 more per hour until Lynette walked into his office in September of 2019, to bring the pay disparity to his attention. Knouse began investigating and asked the Human Resources Department of B-Line (HR) to get involved. Ultimately, a meeting was held on December 9, 2019, that involved HR and the union representatives. Knouse did not inform Lynette of the meeting, as he left that to the union representatives.

¶ 13    Knouse identified the minutes from the December 9, 2019, meeting, which set forth the attendees. Eddie was present as a union representative and as the individual whose pay was being discussed. Other attendees included plant managers and union representatives. Knouse was present with HR personnel. Lynette was not present at the start of the meeting. A discussion was held with HR personnel regarding the pay disparity between Lynette and Eddie. Eddie was getting paid "a dollar above the dual" because "a member of management had coded it that way for Eddie and made an agreement with him." Knouse explained that a "dual" is a job classification. It refers to an individual who can operate a crane and a forklift. So, the operator has a "dual responsibility" between the crane and forklift. There were duals that were assigned to the shipping department. A dual, according to the CBA, had a certain wage scale. Knouse did not believe that Lynette, as a part of her job duties, directed the duals in the shipping department.

¶ 14    Knouse testified that Lynette was brought in toward the end of the December 9, 2019, meeting. Knouse explained that Jennifer Kahl, the union business agent, informed Lynette that the company was still looking into the pay issue. Kahl had added, that, "We are still having the

6

conversation and needing to work some things out. They may revisit the job description and add job duties, potentially offering you that job." Knouse testified that this meant the company was going to see if it could "reevaluate the lead responsibility on the day shift lead role to add responsibility to lead the dual operators."

¶ 15    After the December 2019 meeting, a new job description was prepared for first shift shipping lead. There was an ongoing discussion in the company regarding what to put in the job description so that the payment would be the same as Eddie received as second shift lead and got paid for leading the duals. As a result of discussions within the company, in which Eddie participated, the job description for the first shift shipping lead was changed. The payment rate was changed to "Dual Rate + $1 ($20.87 + $1 for 2020)." The new job description did not include any reference to management of the duals, although there were some changes to the tasks set forth in the "Departmental Focus." Knouse believed that Lynette was offered training to become the first shift shipping lead so she would be paid the same as Eddie, but he had no first-hand knowledge of this fact.

¶ 16    On cross-examination, Knouse testified that he was currently the plant manager for the Troy facility. The workers at the plant were members of a union and a collective bargaining agreement was in place that dictated the salaries for each employee's job description. He knew Lynette as an employee who worked as shipping coordinator lead on the day shift, working from 7 a.m. to 3 p.m. The second shift worked from 3 p.m. to 11 p.m., and the overnight shift worked from 11 p.m. to 7 a.m. Knouse acknowledged that Lynette and Eddie had the same titles as shipping coordinators but testified that their job duties were different as shipping leads. Knouse explained that Eddie had the responsibility to step in as a forklift operator when necessary and to train the newer forklift operators. Eddie could run the crane. He was performing those additional

7

job responsibilities almost every day. Knouse further admitted, however, that Lynette had customer support team responsibilities on first shift that Eddie did not have. She also had more direct responsibility to "call in the loads that were going to be done."

¶ 17    Knouse again explained the restructuring that was done by the company in 2019 pursuant to a grievance unrelated to this action. The restructuring was performed to ensure that there was equity throughout the "unionized operation." After Lynette brought up the pay disparity between herself and Eddie, there was another restructuring. This time, the company wanted to afford Lynette the opportunity to learn the same job as the second shift shipping lead. Brittany Robinson, Lynette's supervisor, would have had a discussion with Lynette about taking on this new job, although Knouse was not there personally for the discussion. Knouse testified that Lynette opted not to take the job and "voluntarily removed herself from the lead." After Lynette stepped down, the job was assumed by Jean Burnett, who had the same skill set as Eddie in that she could operate the forklift and the crane. Burnett was then paid the same as Eddie. Krouse noted that Eddie was no longer working as the second shift shipping lead. Eddie moved to the day shift and received the same pay as Lynette, who was still working in the shipping department.

¶ 18    One of Lynette's co-workers, Robert Landry, testified that he has been with B-Line for 46 years in the shipping department. He described Lynette's abilities to perform her job duties as "excellent." He indicated that Lynette did the "LTL's—Less Than Truckloads"—for various trucking companies. She talked to sales and solved problems and made up sheets for the dual operators. He described it as a "very stressful shift." Based upon his experience, he opined that Lynette was performing as shipping lead according to all of the expectations of the job. Landry testified that he was one of the lead men who was stripped of his pay as a apart of the restructuring where the shipping department was reduced to having one lead. That is when Lynette got the lead.

¶ 19    Lynette testified that she had been employed at B-Line since October of 1999. She worked in the shipping department for 13 years, and from March 2019 to March 2020 she held the position of shipping lead for the first shift. She testified that she performed the work according to the job posting for the 2019 first shift shipping lead. As shipping lead, her job was to "get things shipped out the door." She handled the LTLs and customer service all day long. Lynette explained that she directed the duals as a part of her job from March 2019 to March 2020. She pulled load tickets when she came in and created a load sheet which she gave to the duals which told them where to find the product. Her job was to make sure the product was on the truck. The job was stressful because trucks are delivering in all directions trying to get the product to the customer. Lynette further indicated that in directing the duals, she often went to the floor where they were located to make sure an order was properly filled. Lynette indicated she watched the duals "to make sure they were operating safely." Lynette opined that she had "face-to-face direct communication with the duals." She would tell them what product goes where for shipping out. She did a lot of "troubleshooting." She also went on the truck after it was loaded "to make sure everything was right." If something was left off of the truck, she contacted the dual. If something extra was on the truck, she had to contact the dual to take it off. Lynette testified that she did more work than the second shift shipping lead because she had the paperwork for the loads ready by second shift. There was far less paperwork on second shift because "the pickups, the bills, everything's done. All they've got to do is come in—as the pickups come in, they just load it."

¶ 20    Lynette recalled that she had an initial meeting with Knouse in September 2019. She told Knouse she thought it was unfair that Eddie was getting paid more than she was. Lynette testified that Knouse agreed and indicated he would look into it.

¶ 21    Lynette testified about the meeting held on December 9, 2019. She noted that she had not been invited to attend beforehand. Knouse had called her up to the conference room to join "a whole room of people." Lynette explained that she was not prepared to present her wage claim because she did not know the meeting was occurring. She would have wanted her union representative with her. In addition, she would have called some co-workers as witnesses and had written down what she wanted to say. She did not have the opportunity to do so. Lynette testified, "I mean, I just walked into everybody there and it was almost over." The business agent, Kahl, told Lynette that "they would change a few things." Lynette was never told what they wanted to change. Lynette denied that Robinson offered any further training opportunities for the new dual responsibilities that were created in March 2020.

¶ 22    With regard to her claim for damages from March 10, 2019, to March 22, 2020, Lynette calculated her diminished earnings by taking the difference between Eddie's pay and her pay, which was figured at $0.40 per hour on regular time and $0.60 per hour on overtime, and then multiplied that amount by 57 weeks. She calculated a pay difference of $2,067.20, including interest. Lynette also calculated her diminished earnings from March 23, 2020, through June 30, 2025. She explained that she used the end date of June 30, 2025, because she had to retire at 67, and this represented the date of her retirement. Lynette acknowledged that in calculating this pay, she averaged the number of regular hours she worked and averaged her overtime hours and added the one-dollar loss that she no longer received as shipping lead, which totaled $32,882.28, excluding interest.

¶ 23    Lynette indicated she did not bid for the first shift shipping lead when the job was posted in 2020 because she was hurt by how she had been treated by B-Line. At this point in time, from March 2019 to March 2020 only women were the first shift shipping leads in the plant. All of the

10

men were getting paid a dollar over what she was paid. Eddie told Lynette that he was getting paid more than she was as a second shift shipping lead. Lynette found it was unfair that Eddie received higher pay for performing the same job, and that prompted her to see Knouse. Lynette also thought it was unfair that the company decided Eddie was leading the duals and she was not.

¶ 24 On cross-examination, Lynette acknowledged that the applicable CBA contract language during the time she alleged a pay disparity required that "when an employee is appointed as a lead man by the company, he shall receive a premium of $1 per hour above the highest job classification normally under his direction." In her opinion, as first shift shipping lead, she had always led the duals. However, at the meeting she attended in December 2019 she was informed by those present, including her union representatives and Eddie, that the job Eddie performed was different than the job she was performing. As a result, the company agreed with the union's decision to give a different pay rate for the second shift shipping lead than she received as first shift shipping lead. Lynette was asked about the charge of discrimination she had made with the Department. She acknowledged that she did not raise gender but claimed she was not being paid properly under the collective bargaining agreement. She thought the company had misinterpreted the CBA. Lynette believed she should have been paid over the dual classification, not the shipping coordinator classification.

¶ 25 Lynette admitted that she had never worked the second shift, although the shift times occasionally overlapped; that she did not operate a crane or forklift; and that she had not made a claim based upon gender in her complaint regarding wage disparity. In 2020, Lynette stepped down from the shipping coordinator lead position. She testified that the company "did not forcefully remove" her from the position. Another woman, Burnett, took over that position. Burnett was certified to operate a crane and forklift and could train a dual if necessary.

¶ 26    On redirect examination, Lynette again identified her charge with the Department. She pointed out that she claimed "sex" was the basis for her charge of discrimination.

¶ 27    Lynette's counsel next called Carrie Zylstra-Skinner, the corporate representative for B-Line. Zylstra-Skinner testified that the reason Eddie was paid more was because he was paid a dollar over the rate for the highest class under his direction, which would have been the duals. In 2019, Eddie was leading the duals. In 2019, when Eddie and Lynette took over the shipping leads, Lynette was paid a dollar over the shipping coordinator wage rate, while Eddie was paid a dollar over the wage rate for the dual operators. This was so even though the job descriptions for both the first shift shipping lead and second shift shipping lead indicated payment would be made at the rate of one dollar over the shipping coordinator rate. Zylstra-Skinner could not produce a document from B-Line that approved the increased pay to Eddie for leading the duals. She could not explain why the job postings were the same and did not include Eddie's responsibilities for leading the duals. She distinguished between Lynette's job duties and Eddie's job duties regarding "lead" the duals. "It's very different, though, to provide a load sheet that says what loads go into which truck versus actually actively being out there to facilitate and direct and help assist with putting the loads onto the truck." She admitted, however, that in order to determine "the standard of what constitutes leading the duals," it "is fair to say" that this decision is outside of the terms of the CBA. She agreed that in determining whether particular employees lead the duals, there is no interpretation of language in the CBA. Only the wage rates are in the CBA.

¶ 28    B-Line kept records of the training, and Zylstra-Skinner identified the kind of record maintained by B-Line. However, the company did not produce any training records for Eddie as a part of discovery. Eddie's training responsibilities for the duals were considered as on-the-job

12

training where he showed the new hires the safety requirements around operating forklifts and cranes.

¶ 29 In response to questions from the court, Zylstra-Skinner testified that the union contract had a wage table that always paid pursuant to a certain job classification. Zylstra-Skinner explained that "if someone flexes into a higher class, they would receive the higher pay," but if "someone flexes down, they still maintain their higher rate. So, you always maintain that higher rate." After the restructuring in 2019, even though the job descriptions were to be paid as a "shipping classification plus $1 more," Eddie maintained the higher rate because of his job duties. "Eddie would have had to have flexed into doing additional responsibilities from the dual standpoint, from dual support, from dual lead, because there's not as many people available" on second shift. She explained that when she used the term, "flex," it meant "stepping into a new classification." So, although Eddie was a shipping coordinator, he had to also direct the duals and do dual responsibilities as well. In order for an employee to flex into the additional job responsibilities after the 2019 restructuring, it would have taken a manager's approval, and the approval would have been verbal. But even when the restructuring happened in 2019, "there was no impact on pay. It's always the same, you know, a dollar over the highest class that is normally under their direction." Zylstra-Skinner stated that the reason Eddie was paid a dollar more than set forth in the job description was because he was "leading duals." Therefore, if management made the determination that an employee was leading the duals, then the CBA controlled what the wage classification should be.

¶ 30 The circuit court also inquired as to whether B-Line had any policies that required documentation of all on-the-job training to be kept. Zylstra-Skinner indicated there were no policies, but the records would be kept electronically with HR.

¶ 31    On cross-examination, B-Line's counsel asked Zylstra-Skinner whether the provision in section 11.04 of the CBA regarding payment of "a premium of $1 per hour above the highest job classification normally under his direction" required an interpretation of what was meant by "normally under his direction." She responded that the grievance process could be used by an employee who wanted clarification of an ambiguous term in the collective bargaining agreement. Zylstra-Skinner explained the three-step grievance process that was outlined in the CBA that could be used to resolve disputes with an employee. If the grievance process did not resolve the dispute, there would be an additional step of arbitration. In Lynette's case, she had not filed a grievance under the CBA after the meeting held with the company and union representative in December of 2019.

¶ 32    Zylstra-Skinner identified a chart she had assembled that showed Eddie was paid more from 2013 through 2019 than other shipping coordinator leads. Eddie was being paid the higher amount for supervising the duals. In 2019, B-Line showed that Burnett was being paid the same amount as Eddie, as she was now supervising the duals on first shift. Burnett could operate a crane and forklift, she would do inspections, evaluations, and could train duals. Zylstra-Skinner identified a list of responsibilities that Eddie performed on second shift, that Lynette did not. The list indicated that Eddie "operates forklift and overhead crane, directs other operators of forklift and overhead, loads trucks and directs the loads and paperwork, completes inspection checks, lead reporting of dual safety measures, dock process lead, show duals how to do the job." In her opinion, Lynette did not perform any of those tasks as a lead. Zylstra-Skinner further indicated that as a result of the December 2019 meeting, the union was involved in the decision regarding the appropriate pay that Eddie was receiving. It was determined that Eddie's tasks were different than Lynette's and that Eddie "leads over the duals, so [he] should get a dollar over that class." Zylstra-

14

Skinner further indicated that the company did not make unilateral decisions about pay without consulting the union.

¶ 33    On redirect by Lynette's counsel, Zylstra-Skinner agreed that section 11.04 of the CBA referred to payments for classifications "normally under his direction." She admitted that the notes from the meeting in December 2019 did not indicate there was any discussion regarding the interpretation of the phrase, "normally under his direction." With regard to the grievance process, if a grievance had been filed, a meeting would have been held, and Lynette would have had the right to be present throughout. Zylstra-Skinner considered the December 9, 2019, meeting as a "discussion" and not part of a formal grievance process. She believed that it was up to the union to bring Lynette to that meeting.

¶ 34    Zylstra-Skinner further admitted that during the 57 weeks Lynette alleged a pay disparity, only women worked the first shift as shipping leads, and Eddie worked the second shift shipping lead. Eddie was paid a dollar more than the women because he led the duals. When asked whether the term, "flex," appeared in the CBA, Zylstra-Skinner indicated she did not know, but that she used the term as a "descriptive word." It meant, "moving someone from one class to another or leading one department over another." It refers to classifications in the wage table. She further testified that there was no job description for a "dual lead." It would be a "lead over the duals" because a dual is a job classification, not a department. And at the December 2019 meeting, there was discussion about the "lead over the duals" by the union. This referred to the "higher job classification than the shipping coordinator classification."

¶ 35    At the conclusion of Lynette's evidence, B-Line recalled Knouse, the plant manager. Knouse first acknowledged there were two structural changes that occurred at B-Line—one in 2019 and one in 2020. After the structural change at the plant in March 2019 a decision was made

15

to repost the number of leads required for various jobs. Three people applied for the first position, including Lynette, who went through the interview process and was selected. At the time of this position restructuring, Knouse did not know that Eddie performed different tasks as second shift lead. Therefore, the job descriptions in March 2019 for the first shift lead and the second shift lead did not account for the differences in job duties.

¶ 36   In September of 2019, Lynette came to Knouse and indicated she was not being paid the same as Eddie. Knouse contacted Elizabeth Slife, in HR, who looked into the issue. No grievance was filed. A meeting was held in December of 2019, where the feedback from the participants, including the union, was that Eddie performed different job functions where he led the duals and Lynette led the shipping coordinator class. "So in that December review, the BA and the HR team and I discussed if we could re-evaluate the lead responsibility on day shift to then include responsibilities to enable Lynn to be able to lead the duals." In addition to reevaluating the job description, a discussion was had that an effort should be made to get Lynette more training so that she could get the same pay as Eddie. The business agent for the union, Kahl, explained to Lynette during the December 2019 meeting that Eddie was being paid more than Lynette, but that this "was not known to anyone sitting at the table until [Lynette] brought it to their attention." Kahl further indicated that Lynette performed different job duties than Eddie. Lynette had not filed a grievance, so the process of having her at the meeting was not followed.

¶ 37   After the meeting, HR took a look at the job structure on the first shift and the second shift. The job description for the first shift shipping lead was changed to include the requirement that the lead: "Lead members of the shipping, receiving, pack, crate, and HDG departments." The pay rate for the first shift shipping lead was changed to one dollar above the dual classification rather than the shipping coordinator classification. Knouse claimed that the newly posted job description

16

was amended in March of 2020, to reflect the additional responsibilities to have a lead over the duals on the day shift. Knouse thought that Lynette was given the opportunity to train for the position that had more responsibilities, but she stepped down as first shift shipping coordinator lead. Knouse did not have any first-hand knowledge regarding what was said to Lynette, as this was handled by the shipping supervisor, Robinson.[3] After Lynette stepped down, B-Line then posted the newly revised lead job for the first shift, which was filled by a woman. Additional job duties were added to the March 2020 job description to make sure the first shift lead could lead the duals. Knouse maintained that Lynette was offered the opportunity to make the same amount of money as Eddie by undergoing training on using a crane and leading a dual.

¶ 38    Knouse testified that Eddie no longer worked as second shift lead because he took a position on the first shift in the shipping department. Eddie now works with Lynette and makes the same pay as Lynette. Burnett gets paid more than both Eddie and Lynette because Burnett is first shift shipping lead. The wage scale was determined by the CBA.

¶ 39    On cross-examination, Knouse again admitted that the 2019 job descriptions for the first shift shipping lead and second shift shipping lead were the same. The justification for paying Eddie for leading the duals from March of 2019 to December of 2019, was a retroactive decision, made based upon the union and the company believing that Eddie "did the job of being a lead over a dual." Knouse further acknowledged that when there are reviews, such as occurred at the December 2019 meeting, if Lynette did not know about it, she "may not have been prepared to speak." But the reviews are open, so if Lynette had anything to say, there was nothing that would

---

[3]Brittany Robinson did not testify at trial.

17

have prevented her from speaking up. The notes from that meeting indicated, however, that no one asked Lynette to support her claim.

¶ 40    At the conclusion of Knouse's testimony, B-Line rested its case. The parties submitted various exhibits that were admitted into evidence. Lynette had no rebuttal witnesses and rested her case. Lynette's counsel argued in closing that B-Line violated the Equal Pay Act because Lynette was performing substantially similar work as Eddie. The problem was that in March 2019 when the job descriptions for shipping lead first shift and shipping lead second shift were posted, and contained identical descriptions, B-Line did not know that Eddie was being paid more. Lynette argued that B-Line did not know that Eddie was being paid more until September 2019 when Lynette brought it to Knouse's attention, and then a justification had to be found for having made this payment to Eddie. Lynette further argued that it was fundamentally unfair to Lynette not to have her at the December 9, 2019, meeting, and not to allow her notice and an opportunity to be heard. As a result, she was deprived of her right not to be interfered with in respect to making her claim. Instead, she was simply told about the difference in job duties between first shift and second shift, which was based on Eddie leading the duals. After that meeting, it took until March 2020 for B-Line to change the job posting to add job duties to the first shift shipping lead position. B-Line claimed that Lynette was offered the new job for first shift lead on February 18, 2020, but the evidence was that this would have occurred prior to the new job description being put into place. Lynette argued that B-Line had violated the Equal Pay Act, which is a strict liability statute. A person of one gender cannot be paid more than a person of another gender for performing substantially similar work. Lynette claimed she had suffered damages in the amount of $2,067.21 for 57 weeks as a result of the pay discrepancy between March 2019 and March 2020. Further, because of the new position, and the way Lynette had been treated by B-Line, she argued that she

18

was entitled to damages in the amount of $32,882,28. This represented her diminished earnings from the time of the new job posting on March 29, 2020, to June 29, 2025, the date of Lynette's 67th birthday, which would be the date of her retirement. Lynette further argued that B-Line had violated the Human Rights Act in that Lynette was in a protected class and she was performing her duties within expectations. Eddie, a person outside of her class, was treated more favorably. Thus, the burden shifted to B-Line to show a legitimate nondiscriminatory reason for paying Eddie more than Lynette. Lynette asked for damages in the amount of $10,000 to compensate Lynette for the way B-Line treated her. Lynette also requested attorney fees and costs.

¶ 41    B-Line's counsel also made a closing argument. B-Line relied on the fact that there was a CBA in place that determined how much each of the employees was paid. The CBA directed an additional payment of one dollar above the highest job classification "normally under his direction." Eddie had duals normally under his direction and he was paid according to the CBA. After the first restructuring in 2019, there was one shipping lead for the first shift and one shipping lead for the second shift in the shipping department. B-Line was unaware of the pay disparity until Lynette complained that Eddie was being paid differently. In December 2019 there was a meeting, where Lynette was told she does not perform the same job duties as Eddie. Therefore, Eddie was paid more, pursuant to the CBA. The union representative told Lynette in the meeting that she was going to be offered training to have the opportunity for an even playing field, but Lynette turned that opportunity down. When Lynette decided to step down as a lead shipping coordinator, B-Line hired Burnett, a woman, as first shift lead shipping coordinator who also leads the duals. Further, Lynette did not follow the process set forth in the CBA for bringing grievances regarding her complaint involving contract interpretation. B-Line asked that Lynette's claims be denied and judgment be entered for B-Line.

19

¶ 42   After closing arguments, the circuit court took the matter under advisement. On October 23, 2023, the circuit court issued a written ruling, containing findings of fact and conclusions of law. The circuit court concluded that during the period from March 10, 2019, to March 22, 2020, B-Line violated "the Illinois Equal Pay Act (820 ILCS 112/) ('IEPA')" through pay discrimination and found gender discrimination under "the Illinois Human Rights Act (775 ILCS 5/) ('IHRA')" by paying Eddie more than Lynette for "performing the substantially similar duties." Pursuant to the Equal Pay Act, the circuit court awarded damages in the amount of $2,067.26, including interest, for the period of March 10, 2019, to March 22, 2020, for the pay disparity between Lynette and Eddie. For the period from March 23, 2020, to June 30, 2025, the circuit court awarded diminished earnings damages in the amount of $32,882.28, excluding interest. These damages reflected the additional sum Lynette would have earned if she had continued to work as first shift shipping lead to the date of her retirement. Further, the circuit court awarded Lynette special damages for her emotional distress in the amount of $10,000 for the way B-Line treated her after she reported the pay disparity, including a finding that B-Line "interfered" with Lynette's exercise of her rights under the Equal Pay Act. The circuit court's award of damages was pursuant to the Equal Pay Act, although the circuit court indicated the same amount of damages was sustained because of B-Line's violation of the Human Rights Act. No additional damages were awarded pursuant to the Human Right Act, except that attorney fees and cost were awarded pursuant to both claims. On November 22, 2023, Lynette's counsel filed a petition for attorney fees and costs pursuant to the Equal Pay Act and the Human Rights Act. On May 28, 2024, the circuit court awarded attorney fees in the amount of $118,014.43 and $5,011.31 in costs.

¶ 43                                  II. ANALYSIS

¶ 44    On appeal, B-Line argues that the circuit court erred in finding gender discrimination under the Human Rights Act, that Lynette failed to present sufficient evidence to support a verdict on her Equal Pay Act claim, that the circuit court erred in awarding damages for the time period after Lynette voluntarily stepped down from a lead position, and that the claims are preempted by the LMRA.

¶ 45                             A. Standard of Review

¶ 46    This case involves the construction and application of several statutes, including the Equal Pay Act, the Human Rights Act and the LMRA. Questions of statutory construction are reviewed *de novo*. *King Auto Sales, Inc. v. Act Now Towing*, 2021 IL App (5th) 200143, ¶ 16. When construing statutory provisions, a court's primary goal is to determine and give effect to the intent of the legislature. *King Auto Sales, Inc.*, 2021 IL App (5th) 200143, ¶ 17. The best indicator of legislative intent is the express language of the pertinent provisions of the statute. *King Auto Sales, Inc.*, 2021 IL App (5th) 200143, ¶ 16. If the statutory language is clear and unambiguous, a court will apply the statute as written without resort to other aids for construction. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11. If, however, the statutory language is ambiguous, the court may look beyond its express language and rely on extrinsic aids of statutory construction. *Nowak*, 2011 IL 111838, ¶ 11. In construing a statute, "the court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or the other." (Internal quotation marks omitted.) *Mosby v. Ingalls Memorial Hospital*, 2023 IL 129081, ¶ 31. Statutes that relate to the same subject or are part of the same legislative scheme must also be considered together. *King Auto Sales, Inc.*, 2021 IL App (5th) 200143, ¶ 18. These statutes should be read in a way that is consistent with one another. *King*

21

*Auto Sales, Inc.*, 2021 IL App (5th) 200143, ¶ 18. Finally, a court must consider the consequences that would flow from its interpretation and presume that the legislature did not intend results that are unjust or absurd. *King Auto Sales, Inc.*, 2021 IL App (5th) 200143, ¶ 18.

¶ 47    When a challenge is made to the trial court's ruling following a bench trial, the standard of review is whether the trial court's judgment is against the manifest weight of the evidence. *People ex rel. Illinois Department of Labor v. 2000 W. Madison Liquor Corp.*, 394 Ill. App. 3d 813, 817 (2009). A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence. *2000 W. Madison Liquor Corp.*, 394 Ill. App. 3d at 817-18. As the trier of fact, the trial court is in the best position to judge the credibility of the witnesses, to determine the weight to be given to their testimony, and to resolve any inconsistencies and conflicts. *2000 W. Madison Liquor Corp.*, 394 Ill. App. 3d at 818. A reviewing court should not substitute its judgment for that of the trial court unless the judgment is against the manifest weight of the evidence. *2000 W. Madison Liquor Corp.*, 394 Ill. App. 3d at 817.

¶ 48                                      B. Equal Pay Act

¶ 49    The Equal Pay Act went into effect on January 1, 2004 (Pub. Act 93-6, § 1 (eff. Jan. 1, 2004)). The law prohibits gender-based differences in pay. Section 10(a) of the Equal Pay Act (820 ILCS 112/10(a) (West 2022)) addresses prohibited acts and provides in part as follows:

> "(a) No employer may discriminate between employees on the basis of sex by paying wages to an employee at a rate less than the rate at which the employer pays wages to another employee of the opposite sex for the same or substantially similar work on jobs the performance of which requires equal skill, effort, and

22

responsibility, and which are performed under similar working conditions, except where the payment is made under:

> (1) a seniority system;
>
> (2) a merit system;
>
> (3) a system that measures earnings by quantity or quality of production; or
>
> (4) a differential based on any other factor other than: (i) sex or (ii) a factor that would constitute unlawful discrimination under the Illinois Human Rights Act." 820 ILCS 112/10(a) (West 2022)

The circuit court determined B-Line violated the Equal Pay Act from March 10, 2019, through March 22, 2020, based on a finding that Eddie, the second shift shipping lead, was receiving higher wages than Lynette, the first shift shipping lead, during that period. The circuit court focused on three elements of the Equal Pay Act: (1) whether the employees were performing substantially similar work on jobs, (2) which required equal skill, effort, and responsibility, and (3) which were performed under similar working conditions. See 820 ILCS 112/10 (West 2022). On appeal, B-Line initially argues that Lynette performed a substantially different job from Eddie (her comparator) and was paid differently on a factor other than sex. Therefore, Lynette could not establish a violation of the Equal Pay Act.

¶ 50                           1. Substantially Similar Work

¶ 51    With regard to B-Line's first argument, the circuit court found that Lynette and Eddie were performing "substantially similar duties." The CBA required that B-Line pay the shipping lead one dollar above the highest job classification "normally under his direction." Lynette, as the first shift shipping lead, was paid $20.46 hourly, a dollar above the classification of shipping coordinator, while Eddie, the second shift shipping lead was paid $20.87, a dollar above the

23

classification of dual operator. The first shift shipping lead job was performed by Lynette, a female, where the second shift shipping lead was performed by Eddie, a male.

¶ 52    B-Line argues that the circuit court erred when it relied on the March 2019 job postings and found that Lynette's job responsibilities were substantially similar to Eddie's job duties. B-Line claims that the circuit court failed to compare the actual responsibilities of the job and instead relied on the fact that "the 2019 job postings were identical and listed the exact same duties." B-Line's argument ignores the circuit court's findings.

¶ 53    In its written order, the circuit court referred to the job postings as part of the evidence in determining that Lynette and Eddie performed substantially similar work. The circuit court also relied on the testimony of Knouse, the plant manager, who testified that from March 2019 to March 2020 Lynette and Eddie worked under the same job title of shipping lead "which included the same job duties and responsibilities as set forth in the job posting." The circuit court went on to find that:

> "[Lynette] and Eddie worked under the same Plant Manager, in the same Shipping Department, and at the same Troy plant. Both were responsible for loading the same freight, on the same trucks, using the same docks. Both used the same shipping office, the same computers and software, and completed the same company forms. Mr. Knouse stated that the Shipping Lead job office work and computer skills were the same for 1st and 2nd Shifts."

¶ 54    The circuit court explicitly considered B-Line's argument that Eddie's work as shipping lead was substantially different because of his ability to operate a crane and a forklift, thereby requiring a special skill set that justified paying Eddie a dollar above the dual operators. The circuit court looked at the March 2019 restructuring of the lead positions and noted that if B-Line thought this skill set justified a higher rate of pay, it would have been included in the 2019 job description. Further, once B-Line was made aware of the disparity in pay between Lynette and Eddie, B-Line

24

did not include the operation of the forklift as part of the March 2020 job responsibilities for second shift shipping lead.

¶ 55    The circuit court also concluded that there was insufficient evidence to show that Eddie's responsibilities included training the dual operators. No records regarding Eddie's time spent training dual operators were offered into evidence. The circuit court concluded that whatever job training Eddie performed was "too insubstantial to make the two Shipping Lead jobs unequal." Therefore, the circuit court's conclusion that Lynette and Eddie were performing substantially similar work was not against the manifest weight of the evidence.

¶ 56                         2. Equal Skill, Effort, and Responsibility

¶ 57    B-Line also claims that the circuit court failed to consider the equality of the "skill effort and responsibility" for each of the jobs, and look at the actual work performed, as required by the Equal Pay Act. This claim is also belied by the circuit court's written order. The circuit court specifically considered the additional skill Eddie possessed in his ability to operate a forklift and crane. The circuit court found that these skills were not necessary for the performance of his job as shipping lead from March 10, 2019, to March 22, 2020. To aid in its interpretation of Illinois's Equal Pay Act, the circuit court looked to the federal Equal Pay Act of 1963, which is part of the Fair Labor Standards Act of 1938. See 29 U.S.C. § 206(d) (2018). The circuit court noted that this act "is nearly identical in prohibiting an employer from discriminating between employees on the basis of sex by paying unequal wages. 29 U.S.C. § 206(d)(1)." In addition, the circuit court indicated that "[s]ection 1620 of the Code of Federal Regulations, titled, 'Equal Pay Act,' interprets various provisions of the Federal Equal Pay Act and is regularly applied to the IEPA." The circuit court looked to the provisions of Title 29, § 1620.15 of the Code of Federal Regulations (29 C.F.R. § 1620.15 (2024)) and assessed the equality of skill required in performance of

25

Lynette's job as first shift shipping lead and Eddie's job as second shift shipping lead. Section 1620.15(a) provides in part, "Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding the equality of skill." 29 C.F.R. § 1620.15(a) (2024). The circuit court concluded that the operation of the forklift was not an essential function of the job of shipping lead, and so it could not be considered in determining whether Lynette's job and Eddie's job were substantially similar and whether there was a difference in the skill requirement for the two jobs.

¶ 58    The circuit court also considered the amount of effort put in by Lynette and Eddie. The circuit court relied on section 1620.16(a) of the Code of Federal Regulations (29 C.F.R. § 1620.16(a) (2024)), which provides in part, "Effort is concerned with the measurement of physical or mental exertion needed for the performance of the job." 29 C.F.R. § 1620.16(a) (2024). The circuit court found there was no evidence of any difference in effort required of the first shift shipping lead compared to the second shift shipping lead. In fact, Knouse testified that both Lynette and Eddie put forth a "high degree of work effort." Likewise, there was no evidence of a difference in responsibility between the two jobs. Therefore, the circuit court concluded that the two jobs required equal skill, effort, and responsibility. We agree.

¶ 59                                    3. Working Conditions

¶ 60    Finally, the circuit court looked at the working conditions that the shipping leads were operating under. The circuit court defined working conditions as "surroundings and hazards." There were no hazardous conditions identified at trial for either shift. In fact, the testimony was that the first shift shipping lead and the second shift shipping lead used the same workspace, the same shipping floor and the same docks. The two leads used the same office, the same computers

26

and the same software. The circuit court found the working conditions were substantially similar. We find this conclusion was supported by the evidence.

¶ 61    Considering the foregoing, the circuit court found that Lynette had established the essential elements of her claim under the Equal Pay Act. We agree. Lynette showed that the working conditions for the first shift shipping lead and the second shift shipping lead were substantially similar from March 10, 2019, to March 22, 2020. Therefore, the circuit court determined that B-Line violated the Equal Pay Act when it paid Eddie more than it paid Lynette during that period. The circuit court's determination was not against the manifest weight of the evidence.

¶ 62                                    4. Other Factors

¶ 63    B-Line counters by claiming there was no violation based on the pay differential because the Equal Pay Act sets forth certain conditions which B-Line asserts as affirmative defenses. Here, B-Line relies on the exception which states that it could prove the pay disparity was "a differential based on any other factor other than *** sex." 820 ILCS 112/10(a)(4) (West 2022). Specifically, B-Line claims that the CBA valued dual operators at $0.40 higher per hour than shipping coordinators. B-Line claims that the union and the company jointly interpreted the CBA to conclude that Eddie performed the additional tasks of leading the dual operators and that Lynette did not. Therefore, Eddie was entitled to the higher payment. B-Line was under the obligation to prove the affirmative defense.

¶ 64    The circuit court evaluated B-Line's claim that the CBA required that Lynette be paid differently than Eddie and determined that the decision was made "retroactively" at the December 9, 2019, meeting to justify the payment to Eddie. As the circuit court noted, the minutes of the December 9, 2019, meeting do not speak to the terms of the CBA, which would have interpreted the question of whether the duals were "normally under his [Eddie's] direction." Instead, the

27

parties in attendance at the meeting discussed Eddie's job duties and whether he led the dual operators. The same discussion did not occur with regard to Lynette's duties. Moreover, B-Line could not produce a witness with personal knowledge of the factor upon which the payment to Eddie was made at the time it was decided in 2013. Neither Knouse nor Zylstra-Skinner could explain the nature of the agreement under which B-Line made the decision to pay Eddie at the higher rate. Therefore, "the factor upon which the differential was based is unknown" and there was insufficient evidence to show that payment was based on a factor other than sex. In light of the foregoing, we conclude that the circuit court's determination that B-Line did not carry the burden of proving its affirmative defense was not against the manifest weight of the evidence. Further, we agree with the circuit court that B-Line violated the Equal Pay Act.

¶ 65                                    5. Damages

¶ 66     Having found that B-Line violated the Equal Pay Act, the circuit court considered damages available under the statute. The circuit court first looked to the Equal Pay Act and determined Lynette was entitled to recover "the entire amount of any underpayment with interest" together with costs and reasonable attorney fees. 820 ILCS 112/30(a) (West 2022). The circuit court examined the methodology used by Lynette to calculate her diminution in earnings and agreed that Lynette had suffered damages in the amount of $2,067.26 from March 10, 2019, to March 22, 2020. The circuit court then considered the amount of damages Lynette claimed to have suffered from March 23, 2020, the day she stepped down as first shift shipping lead, to June 30, 2025, the date of her anticipated retirement. Lynette had calculated the amount of her loss as $32,882.28, exclusive of interest. The circuit court concluded that the methodology used to calculate these damages was sound and awarded damages for diminished earnings in this amount.

28

¶ 67　　B-Line disagrees with the award of $32,882.28, claiming that Lynette is not entitled to back pay under the Equal Pay Act because she voluntarily resigned her shipping coordinator lead position on March 23, 2020. B-Line points to Lynette's testimony that she stepped down from the shipping lead position based upon her own decision and the company did not forcibly remove her from the lead position. B-Line also claims Lynette did not prove that her workplace was so intolerable she had to resign. Rather, she continued to work in the shipping department through the date of trial. Further, Lynette did not accept the position of first shift shipping lead in 2020 when it was offered to her.

¶ 68　　B-Line ignores the plain language of the Equal Pay Act, which provides for damages for violations of its provisions. 820 ILCS 112/30 (West 2022). If an employer pays employees "less than the wage to which he or she is entitled in violation of Section 10 or 11 of this Act, the employee may recover in a civil action the entire amount of any underpayment together with interest, ***, and the costs and reasonable attorney's fees as may be allowed by the court and as necessary to make the employee whole." 820 ILCS 112/30(a) (West 2022).

¶ 69　　B-Line argues that Lynette was not entitled to damages for stepping down from her position as first shift shipping lead because she cannot show she was actually or constructively discharged. "Constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced to resign involuntarily, and when that happens, the employer is liable for any illegal conduct as if it had formally discharged the aggrieved employee." *Steele v. Illinois Human Rights Comm'n*, 160 Ill. App. 3d 577, 581 (1987). The *Steele* court relied on the test used by various federal courts under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.* (1976)) in determining the circumstances of constructive

29

discharge. *Steele*, 160 Ill. App. 3d at 581. The *Steele* court adopted the "reasonable person" standard applied in the federal courts:

" 'Before a "constructive discharge" may be found, entitling the employee to quit working altogether rather than accepting a transfer which he thinks is violative of his constitutional rights, the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Steele*, 160 Ill. App. 3d at 581 (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)).

¶ 70    Here, the circuit court found that B-Line had violated the Equal Pay Act by paying Lynette differently than Eddie for performing substantially the same work. Lynette calculated the sums she would have received if she continued to serve as shipping lead. Based upon her calculations, the circuit court found that Lynette had suffered diminished earnings damages from March 23, 2020, to June 30, 2025, in the amount of $32,882.28. Considering the testimony and proof before the circuit court, there is sufficient evidence in the record to support the circuit court's award of diminished earnings for March 23, 2020, to June 30, 2025.

¶ 71    The testimony revealed that B-Line reevaluated its job description for first shift shipping lead in March 2020. The revised job duty included the lead of the dual operators. Knouse testified that he believed Lynette was offered the position, although she did not have the training for the job. Lynette denied she was offered the job. Knouse did not explain how or why Lynette could be offered the job that she was not qualified to accept. Therefore, there was evidence from which to find that this change in the job description essentially eliminated Lynette from the job she had held prior to the March 2020 reorganization. The circuit court could reasonably find that Lynette's

30

decision not to bid on the first shift shipping lead in March 2020 was causally related to B-Line's denial of Lynette's rights under the Equal Pay Act and the Human Rights Act. Lynette testified that she was devastated by the treatment she received from B-Line after making her informal complaint to Knouse. B-Line and the union participated in a meeting on December 9, 2019, to discuss the unequal payment claim, excluding Lynette. Lynette was not given the opportunity to be heard on the inequity of pay or justify her job position, as the union and B-Line had already decided that Eddie would be paid more than Lynette based upon his lead of the duals. B-Line interfered with Lynette's claim under the Equal Pay Act and Lynette indicated she was humiliated. Therefore, the evidence is sufficient to find that a reasonable person in Lynette's shoes would have felt compelled to resign. Accordingly, the circuit court's award of the diminished damages in the amount of $32,882.28 was not against the manifest weight of the evidence.

¶ 72    Next, the circuit court determined whether an award of special damages for interference with Lynette's exercise of her rights under the Equal Pay Act was warranted. See 820 ILCS 112/10(b), 30(a-5) (West 2022). The circuit court accepted the testimony that Lynette was humiliated by the conduct of holding the December 9, 2019, meeting to address her unequal pay claim, without notice to Lynette, only calling her into the meeting after the issues had been discussed and decided upon. The circuit court concluded that basic notions of fairness were absent, such as notice, the opportunity to be heard and the opportunity to present her case that as first shift shipping lead she also directed the dual operators. The circuit court awarded Lynette the sum of $10,000 as special damages for B-Line's interference with Lynette's Equal Pay Act claim and her emotional distress. B-Line has made no argument to the contrary in this appeal. We agree that this award was warranted.

¶ 73                     C. The Illinois Human Rights Act

¶ 74    In count I of the complaint, Lynette pleaded a violation of the Human Rights Act (775 ILCS 5/1-102 (West 2022)). The circuit court considered that in order to make a *prima facie* showing of gender discrimination, Lynette had to prove (1) she was a member of a protected class; (2) she was meeting her employer's legitimate employment expectations; (3) she was subjected to an adverse employment action; and (4) a similarly situated employee, who was not a member of the protected group, was treated more favorably. After consideration of all the evidence, the circuit court found that B-Line violated the Human Rights Act through gender discrimination.

¶ 75    On appeal, B-Line agrees that to establish a claim of gender discrimination under the Human Rights Act, Lynette must show that (1) she is a member of a protected class, (2) she was meeting her employer's legitimate business expectations, (3) she suffered an adverse employment action, and (4) the employer treated similarly situated employees outside the class more favorably, citing *Terada v. Eli Lilly & Co.*, 2015 IL App (5th) 140170, ¶ 25. There is no dispute that Lynette is a member of a protected class, or that she was meeting her employer's business expectations. The circuit court found Lynette had suffered an adverse employment action as a result of the underpayment of wages to Lynette from March 10, 2019, to March 22, 2020.

¶ 76                          1. Similarly Situated Employee

¶ 77    B-Line claims, however, that there is no evidence that Lynette was similarly situated as Eddie. In order to prevail by showing a similarly situated employee was treated differently, Lynette must show the purported comparator was "directly comparable to her in all material respects so as to eliminate other possible explanatory variables." (Internal quotation marks omitted.) *Gamble v. County of Cook*, 106 F.4th 622, 626 (7th Cir. 2024); *Motley v. Human Rights Comm'n*, 263 Ill. App.

32

3d 367, 373 (1994) ("The Illinois Appellate Court has previously relied upon Federal cases arising under title VII of the Civil Rights Act of 1964 [citation.]").

¶ 78    B-Line claims that Eddie's job could not have been similarly situated to Lynette's because Eddie did different job tasks and had different responsibilities. B-Line claims that on the second shift, Eddie operated the forklift and overhead crane, directed other operators on the forklift and overhead crane, loaded trucks, directed the loads, completed inspection checks, reported dual operator safety measures, established a dock check process, and showed dual operators how to do their job.

¶ 79    Despite these representations by B-Line, the evidence at trial was not so clear. No documentation was introduced regarding the alleged training Eddie provided. The circuit court found the evidence lacking regarding the amount of time Eddie spent training the dual operators. The defining job descriptions for 2019 were identical for the first shift shipping lead and the second shift shipping lead. "There was no evidence quantifying the dates, times, the percentage time [Eddie] operated the forklift other than to suggest that [Eddie] filled in for a Dual Operator who did not report for a scheduled shift." The circuit court determined that Eddie would have been the best person to testify regarding the job differences he performed, but he was not called as a witness. The circuit court found that operating the forklift was not an essential function of the shipping lead. And there was no inclusion of these job duties in the job description during either the March 2019 restructuring or the March 2020 restructuring. Moreover, Lynette testified she did much of the same work as Eddie. Therefore, the circuit court's finding that the employees were similarly situated was not against the manifest weight of the evidence.

¶ 80    Additionally, the circuit court's finding that Eddie was treated more favorably is not against the manifest weight of the evidence. It is undisputed that Eddie was paid more than Lynette for

33

what the circuit court concluded was substantially similar work. Therefore, Lynette made a *prima facie* showing that B-Line violated the Human Rights Act.

¶ 81                    2. Legitimate Nondiscriminatory Reason

¶ 82    Having found that Lynette made a showing that B-Line violated Human Rights Act, the burden shifted to B-Line to show a "legitimate nondiscriminatory reason" why Eddie was paid more than Lynette as shipping lead. B-Line claims it has shown such a reason based upon the express terms of the CBA, which allowed Lynette to be paid less because she did not have the same responsibilities as Eddie. The circuit court found that B-Line did not articulate a legitimate nondiscriminatory reason for the payment made to Eddie as early as 2013. No one from management could explain why Eddie was paid more prior to 2019, and why the disparity continued after the 2019 restructuring of the job description for shipping lead. Eddie's pay was increased in 2013 and continued until Lynette made a complaint without any member of B-Line's management knowing why this increase was paid. Without any evidence offered by B-Line, the circuit court found there was no legitimate nondiscriminatory reason why Eddie was paid more, and judgment was entered for Lynette on her Human Rights Act claim.

¶ 83    The circuit court also found that B-Line's contention that Eddie was paid at a higher rate because he "led the duals" was not legitimate and was pretextual. The circuit court identified six reasons for its finding, including that the decision in 2019 was reached retroactively, "interpreting a decision made in 2013 in a way that conveniently resulted in a way where Defendant paid no back pay to the Plaintiff (or several other Shipping Leads) and no pay withheld from Eddie Enriquez for being paid an inflated rate." The circuit court also found that the "Defendant's conclusion was inconsistent with the fact that each other Department Lead, who were all male, were paid a dollar above the highest classification in their Department, despite the fact that those

34

Leads did not operate machines or train employees on these machines." B-Line had attempted to "surreptitiously" use the CBA as a basis for its conclusion without referencing whether the dual operators were normally under the direction of the shipping leads. Instead, the query was whether Eddie led the duals, which does not appear in the CBA. Furthermore, B-Line excluded Lynette from the December 9, 2019, meeting, so there was no one to testify whether the duals were actually under Lynette's direction. B-Line, however, permitted Eddie to attend the December 9, 2019, meeting in a capacity as a witness, to testify that he led the duals, and as a union representative, which "was a conflict of interest and completely inappropriate." And, finally, the circuit court found that B-Line based its conclusion on the fact that Eddie operated the forklift, although B-Line did not make this a job duty in the 2020 shipping lead job posting. We agree with the circuit court's findings and conclude that the circuit court's judgment for Lynette on her claim under the Human Rights Act is not against the manifest weight of the evidence.

¶ 84                                     3. Damages

¶ 85    The circuit court found that Lynette had sustained damages under the Human Rights Act claim as a consequence of her gender discrimination claim. The circuit court had already awarded damages pursuant to the Equal Pay Act claim. Therefore, the circuit court determined that Lynette was not entitled to collect additional damages under her Human Rights Act claim, except for attorney fees and costs.

¶ 86                                      D. LMRA

¶ 87    Finally, B-Line claims that Lynette cannot be entitled to a judgment under the Equal Pay Act or the Human Rights Act because her claims were preempted under section 301 of the LMRA. To determine whether a claim filed pursuant to a state statute or common law tort is preempted, the court examines the character of the claim. *Gelb v. Air Con Refrigeration & Heating, Inc.*, 356

Ill. App. 3d 686, 692 (2005). When "resolution of a state-law claim depends on an interpretation of the collective bargaining agreement, the claim will be preempted." *Gelb*, 356 Ill. App. 3d at 693. B-Line argues that Lynette's claims are preempted because the resolution of her claims rely on the interpretation of the CBA. B-Line argues there is no dispute that the wage rates for shipping coordinator leads are controlled by the CBA between the company and the union. Under the terms of the CBA, the company lacks the discretion to pay employees differently than what the CBA requires. B-Line claims that if there are questions under the contract as to what level of pay is appropriate, that decision is made under the terms of the contract and the union is heavily involved in all discussions and determinations. B-Line's continuing argument is that Eddie was paid more than Lynette because of the contract interpretation setting different wages for different tasks. Under the CBA, the company must pay the lead based upon the highest job classification "normally under his direction," which, for Eddie, according to B-Line, would have been the dual operators. The company and union made the determination that, for the period from March 2019 onward, the highest classification under Eddie's direction was the dual operator and the highest classification under Lynette's direction was the shipping coordinator and they should get paid $1 above those respective job classifications.

¶ 88    The circuit court found these arguments unavailing and we agree. The circuit court found Lynette's claims under the Equal Pay Act and the Human Rights Act to be "outside the parameter of the Collective Bargaining Agreement." In making such a finding, we note that the CBA did not describe the job duties of leading the dual operators. No one from B-Line could explain why Eddie was being paid more, commencing in 2013, than the amounts represented by the CBA.

36

¶ 89    The circuit court utilized the test enunciated by our supreme court in *Ryherd v. General Cable Co.*, 124 Ill. 2d 418, 426 (1988), to determine whether a claim is preempted. There, the supreme court stated:

> "The test which emerges is simple: if the employee could not bring the claim 'but for' the collective-bargaining agreement, the claim is preempted. Conversely, section 301 does not preempt 'state rules that proscribe conduct, or establish rights or obligations, independent of a labor contract.' " *Ryherd*, 124 Ill. 2d at 426 (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 212 (1985)).

¶ 90    Applying this test, the circuit court found that Lynette's claims under the Equal Pay Act and the Human Rights Act did not require an analysis of the CBA. The circuit court determined that these claims arose under state law and were independent of the CBA. "The essential elements of each cause of action are not found in the Collective Bargaining Agreement." The circuit court found that both the Equal Pay Act and the Human Rights Act "set forth our State's clearly mandated public policies to be free from unequal pay and gender discrimination." The circuit court concluded that neither the Equal Pay Act nor the Human Rights Act were preempted by section 301 of the LMRA. We agree.

¶ 91    B-Line also argues that Lynette's claims should be dismissed because she did not follow the grievance procedures of the CBA. Therefore, she did not exhaust her administrative remedies under the CBA. It is true that federal labor policy provides that "when resolution of a state law claim depends on an analysis of the terms of the agreement, the claim must either be arbitrated as required by the collective bargaining agreement or dismissed as preempted under section 301 of the Labor Management Relations Act (29 U.S.C. § 185(a) (2000))." *Kostecki v. Dominick's Finer Foods, Inc., of Illinois*, 361 Ill. App. 3d 362, 368 (2005). However, B-Line's reference to the CBA

37

is not enough to preempt a state law claim. If the claim raises a matter that is purely a question of state law and is entirely independent of any understanding of the terms of a collective bargaining agreement, it may proceed as a state law claim. *Kostecki*, 361 Ill. App. 3d at 368; *Gelb*, 356 Ill. App. 3d at 692-93 (citing *Livadas v. Bradshaw*, 512 U.S. 107, 124-25 (1994)). Inasmuch as we agree with the circuit court that the CBA did not control the claims made by Lynette, we conclude that she was not required to follow the grievance procedures of the CBA.

¶ 92     Finally, we must address several issues raised by the dissent. First, the dissent opines that Lynette's Equal Pay Act claim and Human Rights Act claim are preempted by section 301 of the LMRA, and, as such, she was required to follow the grievance procedure in the CBA. The dissent alternatively posits that the circuit court lacked subject matter jurisdiction to consider Lynette's claim for constructive discharge, and even if there was jurisdiction, the claim fails. Finally, despite acknowledging that B-Line did not request appellate review of the interference award or attorney fee award in its initial brief and thereby forfeited the argument, the dissent would, nevertheless, vacate the awards. Notably, not once does the dissent consider or give proper deference to the extensive factual findings made by the circuit court as dictated by the applicable standard of review. Instead, the dissent artfully articulates general principles of law and then applies its own findings in support of its conclusions. Because the dissent's analysis of the facts is not supported by the record, the dissent's conclusions are ill-advised.

¶ 93     Initially, we consider the dissent's conclusion that Lynette's claims were preempted by section 301 of the LMRA. After reciting the general principles of federal preemption, the dissent acknowledges our supreme court's decision in *Ryherd*. The dissent correctly notes that in *Ryherd*, our supreme court agreed that federal preemption cannot be avoided by simply recasting a claim for breach of a collective bargaining agreement as a state tort or contract claim but then fails to

38

recite and apply the test enunciated in *Ryherd* to the facts in this case. As noted earlier, the test was simple: "if the employee could not bring the claim 'but for' the collective-bargaining agreement, the claim is preempted. Conversely, section 301 does not preempt 'state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.' " *Ryherd*, 124 Ill. 2d at 426 (quoting *Allis-Chalmers*, 471 U.S. at 212). Here, Lynette's state law claims were not dependent upon the CBA. Even the dissent recognizes that the pleadings did not involve the CBA. In support of its finding that the claims were preempted, the dissent refers not to the pleadings at issue before the circuit court, but rather to the complaint Lynette filed with the Department and the right to sue letter issued by the Department. The dissent stretches beyond the pleadings before the circuit court to find that Lynette had recast her claim for breach of the CBA as a state tort claim.

¶ 94    The dissent views Lynette's case from the wrong perspective. Specifically, the dissent concludes that Lynette's wage disparity claims "stem directly from the language in the CBA that sets forth how leads are to be paid." *Infra* ¶ 125. This is not supported by the record. Lynette alleged and testified that she believed Eddie was paid more than Lynette because of her gender. No one from B-Line could explain why Eddie was paid more. Knouse, the plant manager, had no knowledge that Eddie was paid more until Lynette made her complaint. The documentary evidence showed that after the restructuring in 2019, the job descriptions for first and second shift lead were identical and the rates of pay for each shift were the same. Knouse testified that at the time the job descriptions were posted in 2019, he did not know that Eddie was being paid more than the rates reflected in the job postings. No one referred to the CBA to explain why Eddie was treated differently. B-Line referred to the CBA retrospectively, as an affirmative defense, to attempt to justify the increase in the rate of pay for leads. But B-Line's own designated corporate

39

representative, Zylstra-Skinner, testified that "no interpretation of language in the CBA" was required to determine who led the duals. Thus, based upon the testimony and the evidence offered at trial, the circuit court reasonably concluded that Lynette's claims did not arise out of the CBA and were wholly independent of that agreement.

¶ 95 The dissent acknowledges that "the CBA fails to further explain how the phrase 'job classification normally under [the lead's] direction' is determined." The dissent concludes that the absence of explanatory language created an ambiguity in the contract that the circuit court failed to address. *Infra* ¶ 125. It is important to point out that B-Line did not raise this issue. Thus, the dissent again stretches outside the record to raise and then address a matter not raised by the parties. Here again, the dissent fails to accept that Lynette's claims did not implicate the CBA and that the resolution of those claims did not require interpretation of the CBA. Indeed, B-Line's corporate representative, Zylstra-Skinner, testified that the notes of the December 9, 2019, meeting, "did not indicate there was any discussion regarding the interpretation of the phrase, 'normally under [the lead's] direction.' " Had the interpretation of this phrase been the determinative issue, surely it would have been discussed by the union and B-Line at the December 9, 2019, meeting.

¶ 96 It is also important to remember that Eddie did not testify at trial. Whether Eddie supervised the duals and to what extent he performed the job was described by Lynette. Lynette testified that she performed substantially the same work as Eddie and that she also supervised the duals. Lynette's testimony was not rebutted. After considering the testimony and the exibits offered, the circuit court made extensive findings, comparing the work performed by Lynette and Eddie, and determined the work to be substantially similar. Nevertheless, the dissent disregards the trial testimony and the findings of the circuit court, and instead makes its own finding that the union and B-Line, as signatories of the CBA, had the most knowledge about the actual job duties and

40

which job classifications Eddie and Lynette "normally directed" and that those parties "agreed that Eddie and Lynette's pay rates should be different because Eddie was supervising the duals and Lynette was not." The dissent offers its impression that Lynette's claims were based on the CBA and therefore preempted. *Infra* ¶ 126. In doing so, the dissent improperly substituted its judgment for that of the circuit court on matters of credibility and the weight to be given the evidence. In this case, the circuit court determined that Lynette's state law claims were not preempted by section 301 of the LMRA. After reviewing the record, we do not find that the circuit court's findings were against the manifest weight of the evidence or that its determination was erroneous.

¶ 97    Next, the dissent finds that Lynette was obligated to exhaust her administrative remedies pursuant to the grievance procedures of the CBA. The cornerstone of the dissent's finding rests upon its conclusion that section 301 of the LMRA preempted Lynette's claims. The dissent relies, as it did with preemption, on cases in which the circuit court concluded that an employee's claims arose from a collective bargaining agreement. Generally, the exhaustion of administrative remedies is "a procedural prerequisite to maintaining a section 301 action." *Gelb*, 356 Ill. App. 3d at 695. However, the mere existence of a dispute between an employee and an employer does not render the disputed matter subject to a CBA. *Gelb*, 356 Ill. App. 3d at 695. If the claim, on its face, is governed by the contract, then the employee must follow the grievance process in the contract. *Gelb*, 356 Ill. App. 3d at 695. However, "as long as [a] state-law claim can be resolved without interpreting the [CBA] itself, the claim is 'independent' of the [CBA] for § 301 pre-emption purposes" and, thus, may be addressed under state law no matter whether arbitration has been exhausted. See *Soltysik v. Parsec, Inc.*, 2022 IL App (2d) 200563, ¶ 47 (quoting *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 410-11 (1988)).

¶ 98    Here, Lynette's claims were not preempted by section 301 of the LMRA. Nevertheless, the dissent repeatedly casts Lynette's claims as simple wage disputes and opines that "Lynette's claims of gender discrimination stemmed from an alleged erroneous interpretation of the CBA that altered 'the terms and conditions of her employment' " by affecting her wages." This represents a myopic view of the evidence at trial. As outlined in this order, the evidence at trial established that Lynette was not paid the same rate of pay for the same job identified by B-Line in its job descriptions. Lynette's testimony that she performed substantially the same work as Eddie was unrebutted by Eddie, as he did not testify at trial. There was no testimony offered by Lynette's supervisor or anyone in authority during the relevant time period that explained why Eddie was paid more for a job that was described as identical to the job performed by Lynette. The circuit court found that Eddie's testimony would have been the best evidence of what his job duties were and why he was paid a higher wage over the other shift leads during the extended period of time involved. B-Line failed to call Eddie or any other witnesses to explain why the original decision to pay Eddie additional compensation was made. B-Line did not rely upon any language in the CBA to explain the decision. Thus, the dissent's conclusion that Lynette's claim was a wage dispute that arose out of the CBA is not supported by the evidence in the record.

¶ 99    The dissent acknowledges that Lynette alleged she "performed the same lead duties as the men *** without receiving the dual rate and extra dollar promised to all leads" in her Human Rights Act claim. The dissent then states, "Indubitably, the 'promise' stems from the language under the CBA." *Infra* ¶ 135. We find the dissent's summary dismissal of Lynette's gender discrimination claim troubling because the dissent ignores the trial testimony while it clings to the concept that this is a simple wage dispute under the CBA. The dissent concedes that Lynette's Equal Pay Act claim "seems to stray from CBA governance." But then, the dissent quickly works

42

its way around this perceived glitch in its theory by again going outside of the record to find that the determination of Lynette's correct wages required consideration of "the employees working under Lynette" and the "frequency of Lynette's direction over each of those classifications," and as such required the application and interpretation of the CBA. *Infra* ¶ 135. The dissent's findings are not based upon the testimony offered at trial. Here, the circuit court considered the evidence and determined that Lynette's claim did not depend upon the existence of the CBA and that there was no section 301 preemption. Thus, Lynette was not obligated to follow the grievance procedures set forth in the CBA.

¶ 100    The dissent also addresses the damages awarded to Lynette. The dissent agrees that Lynette made a *prima facie* case for employment discrimination under the Equal Pay Act. The dissent then turns to section 10 of the Equal Pay Act which allows for differences in pay under the statute. 820 ILCS 112/10 (West 2022). The dissent concludes that "B-Line's evidence revealed that Eddie and Lynette were *properly paid under the CBA* noting that a leadman received 'a premium of one (1) dollar per hour above the highest job classification normally under his direction.' " (Emphasis added.) *Infra* ¶ 140. The dissent bases its conclusion on its own finding that "the Union and the company agreed that the duals held the highest job classification *under Eddie's direction*, and the shipping coordinator was the highest classification under Lynette's direction." (Emphasis added.) *Infra* ¶ 141. Here again, the dissent gives no deference to the circuit court's factual findings and credibility determinations. Instead, the dissent substitutes its own judgment for that of the circuit court and makes the ultimate finding that Eddie and Lynette were properly paid under the CBA.

¶ 101    Next, the dissent states that even if it ignores the CBA, "it is clear that Eddie was paid more than Lynette based on additional job-related aspects of his position." *Infra* ¶ 141. The dissent posits that though Lynette made a *prima facie* showing of her claim under the Equal Pay Act, B-Line

43

rebutted the presumption because the Equal Pay Act allowed for additional pay based upon these additional job-related aspects of his position. The dissent concludes that the circuit court's decision to award damages for the period of 2019 to 2020 was contrary to law and therefore against the manifest weight of the evidence. *Infra* ¶ 142. Whether Lynette performed substantially the same work was a factual question for the circuit court as the trier of fact. The circuit court heard the testimony from the witnesses and assessed their demeanor as they testified. The circuit court was in the best position to judge the credibility of the witnesses, to assess the weight to be given the testimony, and to resolve conflicts in the evidence. In this case, Lynette described the relative duties performed by the shipping leads on the first and second shift. She testified that she directed the duals and described the tasks that she performed. The job descriptions for the positions were identical, as was the rate of pay set forth in the job posting. In its defense, B-Line interjected the difference between the job duties of Lynette and Eddie, and claimed that Eddie supervised the duals, although this duty was not included in the job description. Lynette rebutted that evidence. She testified that she, too, supervised the duals. Thus, the circuit court's decision to award damages for the period of 2019 to 2020 under the Equal Pay Act was neither contrary to law, nor against the manifest weight of the evidence.

¶ 102  In addition, the dissent contends that Lynette failed to make a *prima facie* case under the Human Rights Act. The dissent criticizes the circuit court for its insufficient analysis of the "similarly situated employee" requirement. After setting forth the factors to be used in such an analysis, the dissent finds that the circuit court restricted its determination to whether the employees held the same job description and failed to consider the remaining factors. The dissent then offers its own determination, finding that it appeared Lynette and Eddie were not held to the same standards since Eddie "ran forklifts and cranes, spent substantially more time on the floor

compared to plaintiff, and also trained some of the dual operators." The dissent also found that "Eddie had additional qualifications that Lynette did not share and Eddie performed additional duties based on the additional qualifications." *Infra* ¶ 144. A review of the circuit court's written order indicates that the circuit court did not limit its consideration to the job descriptions offered at trial. The circuit court noted that Lynette and Eddie used the same computers, completed the same shipping forms, worked on the same shipping floor, and directed the loading of the same freight in same manner. The circuit court also found that there was no evidence regarding the dates, times, and percentage of time that Eddie operated a forklift or filled in for a dual operator. After considering the evidence as a whole and analyzing the law, the circuit court found that B-Line's contention that Eddie was paid at a higher rate than Lynette because he led the duals and operated forklifts was pretextual and not legitimate. Based on this record, the circuit court's finding that Lynette and Eddie were similarly situated employees was not against the manifest weight of the evidence.

¶ 103  The dissent also disputes the award of "front pay" as diminished earnings damages. The dissent suggests that Lynette's complaint contained no claim for relief under a theory of constructive discharge. Because constructive discharge was not pled in the complaint, the dissent questions the circuit court's jurisdiction to issue an award, although it acknowledges that Lynette could have made an amendment to conform the pleadings to the proofs at trial under section 2-616 of the Code of Civil Procedure (735 ILCS 5/2-616 (West 2022)). Here, the dissent seems to confuse subject matter jurisdiction with the legal sufficiency of the pleadings.

¶ 104  Subject matter jurisdiction refers to "the power of a court to hear and determine cases of the general class to which the proceeding in question belongs." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002). To invoke the circuit court's subject matter

45

jurisdiction, a party need only present a justiciable matter, meaning "a controversy appropriate for review by the court, in that it is definite and concrete, as opposed to hypothetical or moot, touching upon the legal relations of the parties having adverse legal interests." *Belleville Toyota, Inc.*, 199 Ill. 2d at 335. Subject matter jurisdiction does not depend upon the legal sufficiency of the pleadings. *In re Luis R.*, 239 Ill. 2d 295, 301 (2010); *Belleville Toyota, Inc.*, 199 Ill. 2d at 334. Nor is it affected by an erroneous decision of the circuit court. *People ex rel. Scott v. Janson*, 57 Ill. 2d 451, 459-60 (1974). Again, the *only* consideration is whether the alleged claim falls within the general class of cases that the court has the inherent power to hear and determine. *In re Luis R.*, 239 Ill. 2d at 301.

¶ 105    In this case, Lynette filed claims under the Human Rights Act (775 ILCS 5/1-101 (West 2022)) and the Equal Pay Act (820 ILCS 112/10 (West 2022)). The circuit court had subject matter jurisdiction to hear and determine Lynette's claims because the circuit court's jurisdiction extends to the general class of cases arising under these statutes. *Belleville Toyota, Inc.*, 199 Ill. 2d at 340. The dissent suggests that there were "defective allegations and non-existent allegations" regarding underpayment in the complaint, and therefore, that the lack of a justiciable matter stripped the circuit court of subject matter jurisdiction, citing *Ligon v. Williams*, 264 Ill. App. 3d 701, 707 (1994). The dissent's reliance on *Ligon* is misplaced.

¶ 106    In *Ligon*, the circuit court, *sua sponte*, made a determination of child custody at a hearing on the mother's request for an adjudication of parenting and child support. The appellate court found that the circuit court's order was void because the court exceeded its authority where the mother had not sought any relief pertaining to custody and the father had not filed a petition or counterclaim seeking custody. *Ligon*, 264 Ill. App. 3d at 707. Unlike *Ligon*, Lynette's claims under the Equal Pay Act and the Illinois Human Rights Act were properly pleaded and at issue before

46

the circuit court. In addition, the record reveals that the parties conducted extensive discovery related to Lynette's claims, including her claim for damages. Notably, in plaintiff's supplemental answers to defendant's first set of interrogatories, Lynette indicated she would seek damages for "emotional humiliation and distress," as well as punitive damages and attorney fees for prevailing in the litigation. In plaintiff's 213(f) disclosures (see Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2018)), Lynette indicated she would seek damages because she "experienced humiliation, sadness, frustration, and emotional distress resulting from Defendant's violations of the Equal Pay Act and the Human Rights Act, together with Defendant's retaliation, and suffered loss of dignity from being deprived wages only because she is a woman." Lynette further noted that B-Line "retaliated" against her by unlawfully interfering with her exercise of her rights under the Equal Pay Act and Human Rights Act and "humiliated her by holding a meeting on December 9, 2019, without notice" to Lynette, and that she would seek punitive damages. Accordingly, the circuit court had subject matter jurisdiction to hear and decide Lynette's claim and to determine damages.

¶ 107   The dissent further posits that even if it is wrong in its assessment of subject matter jurisdiction, it could not affirm the damage award for constructive discharge. Again, the dissent recites general tenets from case law that describe the relief that can be granted under a theory of constructive discharge. The dissent finds that Lynette did not present any evidence that she was subjected to personal insults, "profanity-laden tirades, defamatory comments, vulgar language" or threats to her personal safety. *Infra* ¶ 158. However, intolerable working conditions are not limited to the conduct identified by the dissent, and the dissent's conclusion that Lynette's evidence did not even reach the level of "merely intolerable" is based upon a subjective assessment of the testimony.

¶ 108   Constructive discharge occurs when working conditions are so intolerable or the employee is so mistreated at work that a reasonable person in the employee's position would be forced to quit. *Steele*, 160 Ill. App. 3d at 581. Constructive discharge also occurs when an employer altered one of its employees' working conditions to the point where the employee had effectively been fired and compelled to leave. *Raintree Health Care Center v. Human Rights Comm'n*, 275 Ill. App. 3d 387, 395 (1995). In *Raintree Health Care Center*, 275 Ill. App. 3d at 387, the appellate court found a sufficient basis for a constructive discharge claim where the Human Rights Commission determined that the employer's actions precluded the employee from performing his normal job duties and "deprived him of the salary he would have earned." The employer's actions "amounted to, at a minimum, a constructive discharge and clearly constituted an adverse employment action." *Raintree Health Care Center*, 275 Ill. App. 3d at 396. In *Raintree*, the employee was also not allowed to return to work. This case is analogous to *Raintree* in that there was evidence that B-Line's action in creating a new job description for the first shift lead adversely impacted Lynette and excluded her from that employment position. There was evidence that Lynette was not qualified to return to her position after B-Line changed the job description because she could not operate a forklift or a crane. Lynette indicated she was never offered the newly described job as first shift lead and that she was never offered additional training. Lynette claimed the disparity in pay was unfair. Lynette testified that she was "humiliated" and "devastated" by the way B-Line treated her subsequent to her report of the disparity in pay. In light of everything that had occurred, she did not apply for the first shift lead position.

¶ 109   It bears repeating that a reviewing court may not reweigh the evidence or substitute its judgment for that of the trier of fact. The circuit court heard from Lynette and the other witnesses. The circuit court found that B-Line violated Lynette's rights and humiliated Lynette by holding

48

the December 2019 meeting to address her unequal pay claim without notice or representation and by calling Lynette into the meeting only after the matter was discussed and decided. The circuit court found that a reasonable person in Lynette's position may have felt compelled to change jobs. The circuit court's findings of fact and credibility determinations are entitled to deference. The circuit court's decision to award diminished earnings damages was not against the manifest weight of the evidence.

¶ 110   Finally, the dissent directs its attention to the award of special damages in the amount of $10,000 along with attorney fees and costs totaling $123,025.74, pursuant to section 30(a-5) of the Equal Pay Act (820 ILCS 112/30(a-5) (West 2022)). The dissent acknowledges that B-Line failed to request appellate review of this award in its initial brief, thereby precluding appellate review. Forfeiture aside, the dissent concludes that the award should be vacated, reasserting its opinion that the claim was preempted under section 301 of the LMRA and that Lynette was required to follow the grievance procedures in the CBA. Because we have previously determined that Lynette's claims are not preempted and because B-Line has forfeited review of the damages award, no further discussion is required.

¶ 111                                    III. CONCLUSION

¶ 112   In sum, Lynette's claims under the Equal Pay Act and the Human Rights Act are not preempted under section 301 of the LMRA. The circuit court's findings that B-Line violated the Equal Pay Act and the Human Rights Act and that Lynette sustained damages as result of B-Line's violation are supported by the evidence and not against the manifest weight of the evidence. The circuit court's findings that Lynette is entitled to the sum of $2,067.26, including interest, for diminished earnings for the period from March 10, 2019, to March 22, 2020, the sum of $32,882.28 for diminished earnings payable in the future, exclusive of interest, from March 22, 2023, to June

49

30, 2025, and an award of $10,000 in special damages for interference with Lynette's rights under the Equal Pay Act, plus $118,014.43 in attorney fees and $5,011.31 in costs, are not against the manifest weight of the evidence. Accordingly, the judgment of the circuit court is affirmed. This cause is remanded to the circuit court of Madison County to lift the stay of enforcement of money judgment entered pursuant to Illinois Supreme Court Rule 305(a) (eff. July 1, 2017), and for further proceedings as necessary to enforce the judgment.

¶ 113    Affirmed and remanded with directions.

¶ 114    JUSTICE VAUGHAN, dissenting:

¶ 115    I disagree with my colleagues' affirmation of the trial court's decision. It is my opinion that Lynette's claim was preempted by section 301 of the Labor Management Relations Act (LMRA) (29 U.S.C. § 185(a) (2018)) as well as Lynette's failure to follow the grievance procedure delineated in the parties' collective bargaining agreement (CBA). As such, I believe, the circuit court lacked subject matter jurisdiction to render any decision in this case. It is also my opinion that the trial court lacked subject matter jurisdiction to address or award Lynette's claim for constructive discharge for the period from 2020 to 2025, and, even if the court had jurisdiction, the evidence submitted was insufficient to affirm the $32,882.28 award. Finally, it is also my opinion that the underpayment earnings award for $2,067.26 for the period from 2019 to 2020 was insufficiently supported and the "interference" and attorney fee awards, of $10,000 and $123,025.74, respectively, should be vacated.

¶ 116                                   A. LMRA Exemption

¶ 117    "Questions of federal preemption and statutory interpretation present questions of law that are subject to *de novo* review." *Carter v. SSC Odin Operating Co.*, 237 Ill. 2d 30, 39 (2010). The

50

Illinois Supreme Court listed three instances in which federal law preempts state law under the supremacy clause. *Id.* at 39-40. These include:

> "(1) express preemption—where Congress has expressly preempted state action; (2) implied field preemption—where Congress has implemented a comprehensive regulatory scheme in an area, thus removing the entire field from the state realm; or (3) implied conflict preemption—where state action actually conflicts with federal law." *Id.*

"The complete preemption doctrine is a doctrine of federal jurisdiction which, under appropriate circumstances, permits recharacterization of a plaintiff's state law claim as a federal claim so that removal is proper." *Bishop v. Burgard*, 198 Ill. 2d 495, 503 (2002).

¶ 118   "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce *** may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185 (2018). This statutory language is the basis for the consensus that "where a collective bargaining agreement exists between employers and employees who are parties to litigation, their disputes fall within the exclusive purview of federal labor laws, not state laws." *Gelb v. Air Con Refrigeration & Heating, Inc.*, 356 Ill. App. 3d 686, 692 (2005). Assuredly, not all union claims are exempt. *Id.*

¶ 119   Whether section 301 of the LMRA preempts a state law claim entails a " 'case-by-case factual analysis.' " *Byrne v. Hayes Beer Distributing Co.*, 2018 IL App (1st) 172612, ¶ 21 (quoting *In re Bentz Metal Products Co.*, 253 F.3d 283, 285 (7th Cir. 2001)). To determine "whether a claim filed pursuant to state statute or common law tort is preempted, we examine the character of the claim." *Gelb*, 356 Ill. App. 3d at 692. Only if the claim is entirely independent of any understanding

51

of the terms of CBA can the claim proceed as a state law claim. *Id.* Conversely, if the claim is predicated on the rights provided under the CBA, and require interpretation of the CBA or its terms, the claim is preempted. *Id.*

¶ 120   The Illinois Supreme Court acknowledged that "section 301 preemption, unlike other kinds of labor law preemption, has as its goal the creation of a uniform body of Federal labor law." *Ryherd v. General Cable Co.*, 124 Ill. 2d 418, 424-25 (1988). It further noted, "that section 301 preemption cannot be avoided merely by recasting a claim for breach of a collective-bargaining agreement as a State tort claim." *Id.* at 425. Putting the "matter in another way, where the tort claim rests on breach of a duty which would not exist in the absence of the collective-bargaining agreement [citation], the tort claim is preempted. *Id.* at 425-26. Our supreme court and the U.S. Supreme Court agree that state and federal cases may overlap, and the determinant issue is whether the " 'claim can be resolved without interpreting the [collective bargaining] agreement itself.' " *Id.* at 429-30 (quoting *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 409-10 (1998)).

¶ 121   The *Lingle* Court addressed the underlying basis for its previous decisions noting, " 'A rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness' [and] 'eviscerate a central tenet of federal labor contract law under section 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance.' " *Lingle*, 486 U.S. at 411 (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985)). The Court continued, stating, "Today's decision should make clear that interpretation of collective-bargaining agreements remains firmly in the arbitral realm; judges can determine questions of state law involving labor-management relations only if such questions do not require construing collective-bargaining agreements." *Id.*

¶ 122   Here, copies of the CBA in effect for the period from 2018-2020, as well as prior versions of the CBA, are found in the record. In addition to Lynette and B-Line's counsel posing questions to the witnesses about the various versions of the CBA, the circuit court also inquired into the CBA and the language therein. It is undisputed that Lynette's circuit court claims were presented solely as gender discrimination claims—with no reference to the CBA—in the complaint that alleged violations under the IDHR and Equal Pay Act. However, Lynette's allegations in the IDHR complaint, which also claimed, "gender discrimination," specifically referenced the CBA language that "all leadmen shall receive a premium of one dollar per hour above the highest job classification normally under their direction." Lynette's IDHR complaint also alleged that, "The discrimination occurred when the Respondent *erroneously interpreted the collective bargaining agreement* so that a woman was not able to receive her benefits where a man was." (Emphasis added.) Lynette's IDHR complaint further alleged that she "was not paid the premium *according to the collective bargaining agreement, thereby altering the terms and conditions of her employment*." (Emphasis added.) Finally, Lynette's IDHR complaint also alleged that she performed the same or similar work as Eddie and stated that Eddie "has always been paid the 'leadman' premium *as listed in the collective bargaining agreement*."

¶ 123   It is clear that Lynette's basis for the right-to-sue letter was, in her own words, the altered terms and conditions of employment due to her employer's erroneous interpretation of the CBA. I cannot ignore the altered allegations from the original iteration with the IDHR to its current form. Nor can I ignore the fact that Lynette's counsel actually objected to the admission of Lynette's Human Rights Act complaint at trial. It is apparent to me that Lynette's counsel is doing exactly what was prohibited in *Ryherd* by "recasting [Lynette's] claim for breach of a collective-bargaining agreement as a State tort claim." *Ryherd*, 124 Ill. 2d at 425.

53

¶ 124   I do not find it relevant that the CBA failed to contain the job duties of each position at a company as the job or duties a company wants an employee to perform are not subject to Union approval. Conversely, how the employee is paid for performing the job duties does require Union approval as shown by the CBA. In Illinois, a "CBA is a contract and thus is interpreted in accordance with principles of contract law." *Barron v. City of Chicago*, 2025 IL App (1st) 240066, ¶ 30. "[L]anguage of a contract alone ***, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). "If the language of the contract is susceptible to more than one meaning, it is ambiguous." *Id.* In such cases, "a court may consider extrinsic evidence to ascertain the parties' intent." *Id.*

¶ 125   Here, the circuit court found that Lynette's claims were not based on rights created by the CBA and her state law claims did not require interpretation of the CBA. I disagree. As shown above, Lynette's claims of a wage disparity stem directly from the language in the CBA that sets forth how leads are to be paid. My colleagues correctly note the CBA fails to further explain how the phrase "job classification normally under [the lead's] direction" is determined. Typically, where terms of a contract are missing, a court may supply the missing term. See Restatement (Second) of Contracts § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); see also *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 91. Here, however, the circuit court neither addressed the ambiguous phrase nor attempted to supply or define the terms of the CBA, on which Lynette's claims were founded.

¶ 126   Nor did the circuit court address the fact that the Union and B-Line—the two signatory parties of the CBA who were undoubtedly aware of the CBA's intent—agreed that Eddie and

Lynette's pay rates should be different because Eddie was supervising the duals and Lynette was not. Unquestionably, the Union and B-Line were the two parties who had the most knowledge of Eddie and Lynette's actual job duties and which job classifications Eddie and Lynette "normally directed" during the course of their work. As such, it is my impression that the circuit court's finding that the claims were not based on the CBA was erroneous and, instead, I believe preemption of Lynette's claim is required under the LMRA.

¶ 127                                    B. Failure to Follow Grievance Procedures

¶ 128   The circuit court also found that because Lynette's claims were not grounded in the CBA that Lynette was not required to follow the grievance procedures in the CBA. Again, I disagree.

¶ 129   "Where a collective bargaining agreement establishes a grievance and arbitration procedure for disputes arising out of the agreement, an employee alleging a violation of the agreement must attempt to exhaust his or her contractual remedies before seeking judicial relief." *Kostecki v. Dominick's Finer Foods, Inc., of Illinois*, 361 Ill. App. 3d 362, 369 (2005) (citing *Gelb*, 356 Ill. App. 3d at 695). If the claim is one that is governed by the contract, the grievance procedures must be followed. *Id.* at 370. If not, the complainant may file suit in court. *Id.* at 370. " 'Where a collective bargaining agreement adequately addresses an aspect of employee compensation or other working conditions, a state statute will defer to the collective bargaining agreement's grievance procedures.' " *Id.* at 369-70 (quoting *Gelb*, 356 Ill. App. 3d at 695, citing *Daniels v. Board of Education of the City of Chicago*, 277 Ill. App. 3d 968, 973 (1996)). An employee lacks standing to pursue judicial relief without first exhausting the remedies provided by the CBA when the claim arises out of the CBA. *Id.*

¶ 130   One of the CBA's listed purposes is "to establish, through collective bargaining, rates of pay, hours of employment, working conditions, and to establish procedures for the handling of any

grievances that may arise between the Parties." The CBA defines a grievance as "a difference of opinion, disagreement or dispute between the Employer and the Employee *** with respect to the meaning and application of the terms of this Agreement." Here, as shown above, Lynette's claims of gender discrimination stemmed from an alleged erroneous interpretation of the CBA that altered "the terms and conditions of her employment" by affecting her wages. Lynette's statements clearly fall within the definition of grievance as described in the CBA.

¶ 131 The grievance procedure in the CBA contains four steps, with the last addressing arbitration. The first step involves the employee advising a steward of the issue and either the employee or the steward presenting the grievance to the employee's supervisor. Here, it was undisputed that Lynette posed the wage discrepancy issue to Knouse in September 2019.

¶ 132 The grievance procedure found in the CBA states that if the matter is not resolved following the first step, a formal written grievance on a Union form, dated and signed by the employee specifying the provision of the CBA that was allegedly violated, is required. Although the specific provision at issue was the wage section found in article 11 of the CBA, no formal grievance was ever filed by Lynette.

¶ 133 Filing the grievance triggers a company meeting with specified personnel and deadlines that only requires the presence of the aggrieved employee, "if requested." The third step involves a referral to Human Resources and another meeting with predetermined participants as listed in the CBA. Once again, the grievant employee's presence is not required and the employee will only be involved in the meeting, "if requested." If the issue remains unresolved, the option of arbitration is provided with details on how that should occur.

¶ 134 As noted above, the CBA addresses the wages of the employees. Section 4 of article 11 states, "When an Employee is appointed as a leadman by the Company, he shall receive a premium

56

of one (1) dollar per hour above the highest job classification normally under his direction." The CBA also contains the wage schedule for job classifications referenced in section 11.04. The wage schedule reveals that shipping coordinators received an hourly wage approximately 41 cents to 43 cents per hour less than dual operators between 2018 and 2021. There was no dispute that the appropriate pay for a union employee was determined pursuant to the CBA based on the employee's classification and duties performed.

¶ 135   Here, Lynette asserted two claims; one under the Illinois Human Rights Act (775 ILCS 5/1-101 *et seq.* (West 2022)) and the other under the Illinois Equal Pay Act (820 ILCS 112/1 *et seq.* (West 2022)). Under the Human Rights Act, Lynette asserted that she "performed the same lead duties as the men *** without receiving the dual rate and extra dollar promised to all leads." Indubitably, the "promise" stems from the language under the CBA. Under the Equal Pay Act claim, Lynette alleged that she was paid "at a rate less than the rate at which the employer paid to male employees for the same or substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibilities." While this seems to stray from CBA governance, it must be remembered that the parties agreed that Lynette's pay rate was governed by the CBA. Further, to determine Lynette's correct wage, the wages of the employees working under Lynette must also be considered along with the frequency of Lynette's direction over each of those classifications. As such, the allegations require application and interpretation of the CBA which I believe required Lynette to follow the grievance procedures set forth in the CBA.

¶ 136   "The ultimate purpose of a CBA is to express the common understanding of the terms and conditions of employment." *Matthews*, 2016 IL 117638, ¶ 72. It was undisputed that Lynette failed to avail herself of the administrative remedy provided in the CBA and therefore did not exhaust

her contractual remedies in a manner that would allow this claim to proceed. As such, I find the circuit court's holding that Lynette "was not legally obligated to file a grievance" and exhaust her contractual remedies in error. The case should have been dismissed so the proper administrative procedures could be followed and any claims remaining unresolved after completing those procedures, would be heard by a federal district court as required by law.

¶ 137                                   C. Damages

¶ 138                          1. Award for period from 2019-2020

¶ 139   To establish a *prima facie* case of wage discrimination under the Equal Pay Act (case law allows for consideration of claims under the Federal Equal Pay Act (see *Jafri v. Signal Funding, LLC*, 2022 WL 17718429 (7th Cir. 2022)), a plaintiff must show that her work demanded the same (1) responsibilities and (2) skills as the higher-paid male employees. *Jaburek v. Foxx*, 813 F.3d 626, 632 (7th Cir. 2016). A male employee, paid more for "equal work requiring substantially similar skill, effort and responsibilities" performed under similar working conditions, is a comparator under the Equal Pay Act. *Id.* As such, I agree that Lynette made a *prima facie* case for employment discrimination under the Equal Pay Act.

¶ 140   However, the Equal Pay Act allows differences in pay if it is (1) not based on or derived from a differential in compensation based on sex or another protected characteristic; (2) is job-related with respect to the position and consistent with a business necessity; and (3) accounts for the differential. 820 ILCS 112/10 (West 2022). B-Line's evidence revealed that Eddie and Lynette were properly paid under the CBA noting that a leadman received "a premium of one (1) dollar per hour above the highest job classification normally under his direction." Both the Union and the company agreed that the duals held the highest job classification under Eddie's direction, and the shipping coordinator was the highest classification under Lynette's direction.

58

¶ 141   However, even if I ignore the CBA it is clear that Eddie was paid more than Lynette based on additional job-related aspects of his position The additional work performed by Eddie, included operating forklifts and overhead cranes, directing other operators of forklift and overhead cranes, loading trucks, directing the loads, inspection checks, training duals how to perform the job, reporting of dual safety measures, and dock process lead responsibilities. No matter how often Eddie performed those tasks, it was undisputed that Lynette never performed those tasks.

¶ 142   Therefore, while I agree that Lynette invoked the rebuttable presumption with her *prima facie* case, it is my opinion that the presumption is rebutted, as a matter of law, because the law allows for additional payment for regular or occasional differences in duties. *Id*. I also note that the circuit court's reliance on the CBA language to ignore the additional duties, is further evidence that Lynette's claim improperly avoided exemption. Therefore, it is my impression that the trial court's decision to award damages for the period 2019 to 2020 period under the Equal Pay Act was contrary to law and therefore against the manifest weight of the evidence.

¶ 143   I also disagree that Lynette met the requirements of a *prima facie* case under the Human Rights Act. See *Terada v. Eli Lilly & Co.*, 2015 IL App (5th) 140170, ¶ 25. It is my opinion that insufficient analysis of the similarly situated employee requirement was provided. In order to be similarly situated employees, Lynette must show that she and Eddie were " 'directly comparable *** in all material respects.' " *David v. Board of Trustees*, 846 F.3d 216, 226 (7th Cir. 2017) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014)). Relevant factors in making this determination include: " 'whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered

these latter factors in making the personnel decision.' " *Id.* (quoting *Warren v. Solo Cup Co.*, 516 F.3d 627, 631 (7th Cir. 2008)).

¶ 144   Here, the circuit court never moved beyond the first factor addressing the job description. The record is unclear as to whether Eddie and Lynette were held to the same standards; admittedly it appears they were not since Eddie also ran forklifts and cranes, spent substantially more time on the floor compared to plaintiff, and also trained some of the dual operators. I also note that there was no consideration of whether Eddie and Lynette shared the same supervisor. Further, as set forth above, Eddie had additional qualifications that Lynette did not share and Eddie performed additional duties based on the additional qualifications.

¶ 145   Therefore, I can only conclude that the circuit court failed to consider all the relevant factors in determining whether Eddie was a substantially similar employee as three of the four factors were not considered by the court. As such, I find the circuit court's decision arbitrary and therefore against the manifest weight of the evidence. Therefore, even if I believed the case was not preempted, and Lynette was not required to follow the grievance procedures, I would still vacate the circuit court's findings and remand the case back to the circuit for consideration of the relevant factors for this issue.

¶ 146                                   2. Award for period from 2020-2025

¶ 147   The trial court also awarded Lynette $32,882.28 in "front pay" as diminished earnings for the period from March 29, 2020, to June 29, 2025, because Lynette was no longer working as a first shift shipping lead. In legal terms, the award is based on the concept of constructive discharge.[4] See *Steele v. Illinois Human Rights Comm'n*, 160 Ill. App. 3d 577, 581 (1987).

_____

[4]Generally, two types of discharge exist: actual and constructive (see *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 659 (7th Cir. 2001)), although failure to promote or a demotion have also been accepted as

Constructive discharge occurs when, from the standpoint of a reasonable employee, an employer makes employment so intolerable or unbearable that an employee is compelled to resign. *Motley v. Illinois Human Rights Comm'n*, 263 Ill. App. 3d 367, 373 (1994). To create such hostile work environment, "the misconduct must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive work environment." (Internal quotation marks omitted.) *Id.* at 374. "The working conditions must have been so onerous or demeaning the employee has effectively been fired *** and compelled to leave." *Id.*

¶ 148    First, no fact or allegation supporting or even inferring constructive discharge is found in the complaint. Nothing in either count I or count III alleged that Lynette was no longer working in the first shift shipping lead position, that her employment environment was hostile, or that she was no longer working the shipping lead position due to said hostile work environment. Without even the barest of allegations, I question the trial court's jurisdiction to issue an award for constructive discharge, especially without an amendment of the complaint to comport with the evidence (see 735 ILCS 5/2-616 (West 2022)).

¶ 149    "Subject matter jurisdiction is defined solely as the power of a court to hear and determine cases of the general class to which the proceeding in question belongs." *LVNV Funding, LLC v. Trice*, 2015 IL 116129, ¶ 39. In order "[t]o invoke a circuit court's subject matter jurisdiction, a petition or complaint need only 'alleg[e] the existence of a justiciable matter.' " *In re Luis R.*, 239 Ill. 2d 295, 301 (2010) (quoting *In re M.W.*, 232 Ill. 2d 408, 426 (2009)). "[A] 'justiciable matter' is 'a controversy appropriate for review by the court, in that it is definite and concrete, as opposed

examples of "detrimental employment action." See *Bauer v. Hubbard*, 228 Ill. App. 3d 780, 787 (1992). The parties agree that Lynette was not actually discharged by the company; therefore, only constructive discharge is at issue in this case.

to hypothetical or moot, touching upon the legal relations of parties having adverse legal interests.' " *Id.* (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 335 (2002)). "Subject matter jurisdiction does not depend upon the legal sufficiency of the pleadings." *Belleville Toyota, Inc.*, 199 Ill. 2d at 340. "Indeed, even a defectively stated claim is sufficient to invoke the court's subject matter jurisdiction." *In re Luis R.*, 239 Ill. 2d at 301.

¶ 150    Subject matter jurisdiction cannot be waived, and the issue may be raised at any time. *Belleville Toyota, Inc.*, 199 Ill. 2d at 333-34. Indeed, reviewing courts are obligated to consider jurisdictional issues (*id.* at 334), regardless of whether the issue of jurisdiction was raised by the parties. *People v. Lewis*, 234 Ill. 2d 32, 36-37 (2009); *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 213 (2009). "[I]n order to invoke the subject matter jurisdiction of the circuit court, a plaintiff's case, as framed by the complaint or petition, must present a justiciable matter." *Belleville Toyota, Inc.*, 199 Ill. 2d at 334. The court's authority to exercise its jurisdiction and resolve a justifiable question is found in the nature of the case as set forth in the complaint and the relief sought. *People v. Western Tire Auto Stores, Inc.*, 32 Ill. 2d 527, 530 (1965). "To invoke a circuit court's subject matter jurisdiction, a petition or complaint need only 'alleg[e] the existence of a justiciable matter.' " *In re Luis R.*, 239 Ill. 2d at 301 (quoting *In re M.W.*, 232 Ill. 2d at 426).

¶ 151    Whether a justiciable matter is presented, for purposes of establishing subject matter jurisdiction in the circuit court, is determined by the courts on a case-by-case basis. *McCormick v. Robertson*, 2015 IL 118230, ¶ 21 (citing *Ferguson v. Patton*, 2013 IL 112488, ¶ 22). Failures to abide by technical or statutory pleading requirements do not affect subject matter jurisdiction and are instead pleading deficiencies subject to dismissal. See *DeLuna v. Treister*, 185 Ill. 2d 565, 579-80 (1999) (addressing section 2-622 of the Code of Civil Procedure (735 ILCS 5/2-622 (West 1998))) and the court's decision in *In re Custody of Sexton*, 84 Ill. 2d 312 (1981).

¶ 152    However, defective allegations and nonexistent allegations are not the same and the latter, unlike the former, do not cloak a court with a justiciable issue and the accompanying jurisdiction. See *Ligon v. Williams*, 264 Ill. App. 3d 701, 707 (1994). There is nothing "definite and concrete" about nonpled facts and allegations for an unalleged claim found in a complaint with a broadly worded and vague prayer for relief. See *In re Luis R.*, 239 Ill. 2d at 301 (quoting *In re M.W.*, 232 Ill. 2d at 426); *In re Marriage of Britton*, 2022 IL App (5th) 210065, ¶ 39 (quoting *Ligon*, 264 Ill. App. 3d at 707).

¶ 153    "Subject matter jurisdiction refers to the power of the court to adjudge concerning the general question involved [citation] as well as the power to grant the particular relief requested." *In re M.M.*, 156 Ill. 2d 53, 64 (1993). "A party cannot be granted relief in the absence of corresponding pleadings; if a justiciable issue is not presented to the court through proper pleadings, the court cannot *sua sponte* adjudicate an issue." *Suriano v. Lafeber*, 386 Ill. App. 3d 490, 492 (2008). Any such order entered by the court is void, as the court has exceeded its jurisdiction. *Id.*

¶ 154    "The issues in a case are created by the pleadings and allegations, to which the proof must correspond, and a party cannot have relief under proof without allegations." *In re Jackson*, 243 Ill. App. 3d 631, 651 (1993) (citing *Partel, Inc. v. Harris Trust & Savings Bank*, 106 Ill. App. 3d 962, 966 (1982)). Due process requires that both parties know in advance of a proceeding which issues will be tried at that proceeding. *Delarosa v. Approved Auto Sales, Inc.*, 332 Ill. App. 3d 623, 627 (2002).

¶ 155    The Illinois Supreme Court has repeatedly and consistently tied the definition of subject matter jurisdiction to the "justiciable issues" placed before the court. See *Belleville Toyota, Inc.*, 199 Ill. 2d at 340; *Ferguson*, 2013 IL 112488, ¶ 21; *McCormick*, 2015 IL 118230, ¶ 23. The

justiciable issues are governed by the pleadings filed in the court. *Ligon*, 264 Ill. App. 3d at 707; *Suriano*, 386 Ill. App. 3d at 492; *In re Custody of Ayala*, 344 Ill. App. 3d 574, 584 (2003); *In re Marriage of Fox*, 191 Ill. App. 3d 514, 520 (1989). The pleadings frame the issues for the trial court and circumscribe the relief the court is empowered to order. *Ligon*, 264 Ill. App. 3d at 707; *People ex rel. Jackson v. Mannie*, 393 Ill. App. 3d 745, 750 (2009). Therefore, it is my opinion that an award of damages, for which neither facts, nor a cause of action, is found in the pleadings, cannot be affirmed because no justiciable matter—as it relates to the award—was placed before the court providing it with subject matter jurisdiction. To find otherwise violates procedural due process and ignores the ever present need to preserve the integrity of the judicial process.

¶ 156 However, even if I accepted my colleagues' position that Lynette's request for underpayment in the complaint's prayer for relief was sufficient to give rise to a constructive discharge claim, I still could not affirm the award for constructive discharge.

¶ 157 "It is difficult for a plaintiff to show a constructive discharge." *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421, 428 (7th Cir. 2004). Constructive discharge occurs where the working conditions are so intolerable or the employee is so mistreated at work that a reasonable person in the employee's position would be forced to quit. *Steele*, 160 Ill. App. 3d at 581; *Jordan v. City of Gary, Indiana*, 396 F.3d 825, 836 (7th Cir. 2005). Working conditions underlying a constructive discharge claim are egregious and require actions involving more than profanity or defamatory language. See *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1046 (7th Cir. 2000).

¶ 158 Here, there was no evidence of personal threats affecting Lynette's safety. Nor was there evidence of any profanity-laden tirades, defamatory comments, vulgar language or even a personal insult to Lynette. Instead, the evidence revealed that Lynette voluntarily resigned from the first

shift shipping lead position on March 2, 2020, and took another position at the company, because she was upset that she was not being paid the same as Eddie because it was "unfair."

¶ 159    There was no evidence that Lynette was reassigned because she complained about being paid less than Eddie and there was no evidence that Lynette was mocked or ridiculed at her job. Lynette stated she was "devastated" by the company's decision reached at the December 19, 2019, meeting; however, by her own admission, Lynette's job change was a personal choice because she was upset with the company. Such evidence is insufficient as a matter of law because case law requires the underlying working conditions be "more than merely intolerable" to award damages for a constructive discharge claim. *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996). Here, the evidence does not even reach the level of "merely intolerable." As such, I would vacate the $32,882.28 constructive discharge award for the period from March 29, 2020, to June 29, 2025, as was provided under the Equal Pay Act.

¶ 160    I would also deny relief for the same legal concept under the Human Rights Act count which was equally devoid of any facts alleging that Lynette no longer worked as the first-shift or that her work environment was so odious that a reasonable person was compelled to leave their employment. However, even if those allegations, or any allegation, had been included in the complaint, there was no evidence submitted to prove or even infer that Lynette's work environment was offensive, obscene, shocking, repugnant or even loathsome. As such, I find that no award for constructive discharge encompassing the period from March 29, 2020, to June 29, 2025, is warranted in this case.

¶ 161                                    3. Award for "Interference"

¶ 162    The trial court also awarded special damages under section 30(a-5) of the Equal Pay Act (820 ILCS 112/30(a-5) (West 2022)) in the amount of $10,000 along with attorney fees and costs

65

totaling $123,025.74. Section 30(a-5) allows a court to award "special damages not to exceed $10,000 *** as necessary to make the employee whole." *Id.* However, such award is only available if the employer violates section 10(b), 10(b-10), or 10(b-20) (820 ILCS 112/10(b), (b-10), (b-20) (West 2022)) of the Equal Pay Act. *Id.* Here, I agree with my colleagues that no request for review of the interference or attorney fee award was requested in the initial brief and therefore review of these issues are precluded. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief ***."). Regardless, because it is my opinion that this claim was precluded by section 301 of the LMRA, and that Lynette was required to follow the grievance procedures in the CBA, I would also vacate the awards of $10,000 for interference and $123,025.74 in attorney fees.

¶ 163   Finally, while I acknowledge the majority's disagreement with, and mordant response to my dissent, I simply disagree. Lynette's CBA was an employment contract negotiated by her union with her employer, Cooper B-Line. That contract set forth the steps necessary to address grievances that allegedly violated the terms and conditions of her employment. Those same violations were the basis of this case and her right to sue letter obtained from the State. In my humble opinion, the majority's position erodes the importance and relevance of contractual obligations, usurps the authority of the contracting parties of any CBA, and significantly undermines the importance of grievance procedures found in every union CBA in this State.

¶ 164   For the foregoing reasons, I dissent.